257 N.J. Super. 260 (1992)
608 A.2d 407
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
THOMAS LOZADA, JR., DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted May 12, 1992.
Decided June 17, 1992.
*264 Before Judges SHEBELL, SKILLMAN and D'ANNUNZIO.
Wilfredo Caraballo, Public Defender, attorney for appellant (L. Gilbert Farr, Designated Counsel, on the brief).
Robert J. Del Tufo, Attorney General, attorney for respondent (Deborah Bartolomey, Deputy Attorney General, of counsel and on the brief).
The opinion of the court was delivered by SHEBELL, J.A.D.
Defendant, Thomas Lozada, Jr., appeals from his jury convictions and the increased sentence imposed following our grant of a new trial on an indictment charging aggravated sexual assault (N.J.S.A. 2C:14-2a(3)), sexual assault (N.J.S.A. 2C:14-2c), aggravated assault (N.J.S.A. 2C:12-1b(1)), and burglary (two counts) (N.J.S.A. 2C:18-2). Defendant's present sentence aggregated two indeterminate terms not to exceed twenty-two years, whereas the original indeterminate sentences imposed were limited to fifteen years maximum incarceration.
Defendant raises the following arguments on appeal:
POINT I: THE TRIAL COURT ERRED IN ADMITTING THE DEFENDANT'S STATEMENTS.

*265 POINT II: VIOLATIONS OF THE RULES OF DISCOVERY MANDATE REVERSAL OF THE DEFENDANT'S CONVICTION.
POINT III: THE TRIAL COURT ERRED IN ADMITTING CERTAIN ITEMS INTO EVIDENCE (NOT RAISED BELOW).
POINT IV: THE TRIAL COURT ERRED IN DENYING A MISTRIAL AFTER THE VICTIM'S PREJUDICIAL OUTBURST BEFORE THE JURY.
POINT V: THE TRIAL COURT ERRED IN REFUSING TO ADMIT PART OF THE DEFENDANT'S STATEMENT INTO EVIDENCE.
POINT VI: THE TRIAL COURT ERRED IN IMPOSING SENTENCE (NOT RAISED BELOW).
POINT VII: CUMULATIVE ERROR REQUIRES REVERSAL OF THE CONVICTIONS (NOT RAISED BELOW).
Defendant was arrested on March 25, 1985, and subsequently indicted on charges on which he has twice been tried and convicted. His first trial was in January, 1986, and he was sentenced on May 3, 1986 as follows:
Count one: Sexual assault during the commission of a burglary in violation of 2C:14-2(a)(3): Indeterminate term not to exceed 15 years at Yardville, $25 V.C.C.B.;
Count two: Sexual assault by the use of force in violation of 2C:14-2(c): merged into count one;
Count three: Aggravated assault in violation of 2C:12-1(b)(1): Indeterminate term not to exceed 7 years at Yardville, $25 V.C.C.B. penalty to run concurrently with count one;
Count four: Burglary while purposefully inflicting injury in violation of 2C:18-2 merged into count one;
Count five: Burglary in violation of 2C:18-2 merged into count one.
We reversed his convictions on August 17, 1987.
Defendant's retrial took place during November and December, 1988. On April 24, 1989, he was sentenced on count one, aggravated sexual assault, to an indeterminate term not to exceed fifteen years. On count three defendant was sentenced to an indeterminate term not to exceed seven years with the sentence to run concurrently with count one. On count four, burglary, he was sentenced to a consecutive indeterminate term not to exceed seven-years. Count two was merged into count one, and count five was merged into count four.
The evidence reflects that on March 25, 1985, M.D. was living on York Street in Jersey City, when at around midnight, she was awakened by the presence of a man on top of her trying to rape her. The perpetrator inserted his finger into her vagina and also punched her about the head and face. M.D. screamed *266 and fought her attacker, biting his hand. Her screams drew the attention of her upstairs neighbor, who banged on the front door and shouted that she had summoned the police. The assailant then ran toward the back of the house.
The police arrived almost immediately. M.D. described the attacker as a light-skinned male, either Caucasian or Hispanic, wearing a grey sweatshirt with the hood pulled up. The police apprehended defendant a few blocks away. He was running and out of breath, his clothes were disheveled, he was bruised, and his hand was bleeding. Defendant was wearing a grey-hooded sweatshirt and grey sweatpants, both of which had blood on them. The victim accompanied them to a police car where defendant was sitting, but she was unable to identify him at that time. She was bleeding and was taken to the hospital where she was examined and treated for contusions, a broken nose, and loose teeth. Head and pubic hair samples were taken from M.D. at the hospital.
Defendant and his girlfriend testified that on the evening of the attack at around 6:30 p.m., he had visited his girlfriend's home on Fourth Street, Jersey City. During the course of an argument, the girlfriend allegedly bit his hand. He immediately left her apartment and returned home. When he arrived home, his sister, mother, and a family friend noticed that his hand was bleeding. His girlfriend allegedly called him and asked him to return to her house. He went back at 7:00 p.m. and stayed until about 11:30 p.m., when her mother had him leave. Defendant took a shortcut through Montgomery Street Park. As he left the park, he was followed by an unmarked police car which had its lights off. When he got closer to his house, a detective jumped from the car, seized and arrested him. Defendant alleged that the detective beat him and injured his wrists with the handcuffs. Defendant denied any knowledge of the attack on M.D.
Prior to trial, an Evid.R. 8 hearing was held concerning the admissibility of statements made by defendant to an investigator *267 of the Hudson County Prosecutor's Office, who had spoken with defendant after his arrest. The investigator read defendant Miranda warnings before questioning him, and defendant signed a Miranda card, which was witnessed by another officer. Defendant requested an attorney after he was given the Miranda warnings, and, therefore, the questioning was immediately suspended. The investigator, however, remained in the bullpen area with defendant. According to the investigator, the following exchange took place:
Q. Did anything happen about 15 minutes later?
[THE INVESTIGATOR]: I had been, I think, the only thing I had asked him was, if he was comfortable. I believe he wanted a handcuff removed to the other hand. He had some injuries on his hand. I had the police officer, I believe, move it. It has been awhile now and approximately fifteen minutes, he asked me if  he asked me something in regard to how much time he could possibly get for this type of incident.
Q. Did you respond to that?
[THE INVESTIGATOR]: I informed him that he had requested an attorney and that therefore, I could not speak to him unless he wanted to talk to me. He said, well, I am talking to you.
So then, I advised him I was not the person to ask about the length of time. That would be up to a Judge. I had no idea of what type of time he would get for this type of incident.
The trial judge concluded that defendant's statement was relevant and admissible. The judge stated:
The question of the relevance of the statement proffered by the State, that is, how much time could I get for this, I find it relevant. It does carry with it an indication of a consciousness of guilt. It is a voluntary statement offered or it is a voluntary question asked by this defendant after he was advised that he did not have to speak to anyone about this matter.
....
I find from the testimony of [the investigator] that the question to which he refers is asked by the defendant after he was given his Miranda warnings and is a voluntary statement initiated by the defendant.
The investigator, therefore, testified at trial as follows:
Q. Now after about fifteen minutes, after you spoke to Mr. Lozada and read him his rights, was there anything he said to you?
A. Yes. He asked me how much time he could get for this type of thing.
Q. Did he ask you that once?
A. No, several times over the next half hour to hour.
*268 Defendant correctly argues that having invoked his right to counsel after he was apprised of his Miranda rights, interrogation was required to cease until an attorney was present. Miranda v. Arizona, 384 U.S. 436, 474, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694, 723 (1966). Defendant further asserts, however, that the investigator re-initiated the interrogation in violation of defendant's Miranda rights by asking defendant if he was comfortable. The case of Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), delineates what constitutes interrogation. In Innis, the suspect made an incriminating statement after he had been advised of his Miranda rights. The Supreme Court stated:
[T]he term "interrogation" under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. [Id. at 301, 100 S.Ct. at 1689-90, 64 L.Ed.2d at 308 (footnotes omitted)].
An incriminating response is "any response  whether inculpatory or exculpatory that the prosecution may seek to introduce at trial." Id. at n. 5.
We recognize that defendant's response was inculpatory as it was used against him at trial by the prosecutor. However, Miranda's protection extends only to acts of police officers reasonably calculated to elicit an incriminating response. Here, defendant was not questioned regarding the incident. Innis, 446 U.S. at 301, 100 S.Ct. at 1689-90, 64 L.Ed.2d at 308. Thus, the appropriate test is whether the investigator should have known that his conversation would move defendant to make a self-incriminating response.
The investigator noticed that the handcuffs were resting on one of defendant's injuries and was prompted to ask defendant if he was comfortable. The investigator explained:
At first I asked him if he was comfortable. I said something to the effect, does the cuff hurt that one injury he had on his arm and he said, that it did. I called the police officer ... and asked him to move the cuff to the other hand.
These actions should be regarded as words normally attendant to arrest and custody. Id., 446 U.S. at 303, 100 S.Ct. at *269 1691, 64 L.Ed.2d at 309. An inquiry about a suspect's physical comfort is not "reasonably likely" to evoke an incriminating response. There is nothing in the record to suggest that the defendant was especially susceptible to suggestion. After the handcuffs were switched to defendant's other hand, there was no attempt to engage defendant in further conversation. It was defendant who initiated the conversation, and the investigator immediately warned him that he could not talk to him because he had requested an attorney. We are satisfied that defendant's rights were scrupulously honored. See State v. Adams, 127 N.J. 438, 605 A.2d 1097 (1992).
Defendant, however, contends that even if his rights were honored by the police, no valid waiver of those rights was made. See State v. Hartley, 103 N.J. 252, 256, 511 A.2d 80 (1986). Miranda does not bar volunteered statements if defendant has validly waived his rights. Id.; see Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) (discussion of what constitutes a valid waiver). Defendant, even after the investigator reminded him of his previously invoked right to counsel, insisted upon reinitiating their conversation. Where the suspect has voluntarily initiated the conversation with full knowledge of his Miranda rights, the subsequent statements are admissible. State v. Dixon, 125 N.J. 223, 242, 593 A.2d 266 (1991); State v. Fuller, 118 N.J. 75, 570 A.2d 429 (1990).
The findings of the trial judge are supported by clear evidence that defendant voluntarily initiated the conversation relating to the charges against him after being fully advised of his Miranda rights. The trial judge's ruling is, therefore, sustained.

II.
Defendant claims that the trial court erroneously refused to permit defense counsel to admit into evidence portions of defendant's *270 statement to police after the State introduced part of the same statement in its case.
The State's investigator testified on direct examination that defendant asked him how much time he could get for the offense. This was offered as an admission of guilt. However, the investigator also testified that defendant denied responsibility for the crime. When defense counsel on cross-examination asked the investigator if defendant had explained how he got certain marks on him, the investigator answered affirmatively but offered no specifics.
The State argued that although the inculpatory portion of the defendant's statement was admissible as a hearsay exception pursuant to Evid.R. 63(7), which permits admissions by parties, the exculpatory portion pertaining to the incident with his girlfriend was properly barred because it was not an admission against interest and was inadmissible hearsay. Defendant urges that the statement was admissible under one or both of two theories: the doctrine of testimonial completeness, or as an exception to Evid.R. 63(10), an admission against interest.
Defendant's contention as to the applicability of Evid.R. 63(10) is without validity. The fact that he stated that his girlfriend bit him would not appear of itself to subject him to criminal liability or create "such a risk of making him an object of hatred, ridicule or social disapproval in the community that a reasonable man in his position would not have made the statement...." Evid.R. 63(10).
Defendant also claims admissibility under the doctrine of testimonial completeness. According to the doctrine:
[T]he opponent, against whom a part of an utterance has been put in, may in his turn complement it by putting in the remainder, in order to secure for the tribunal a complete understanding of the total tenor and effect of the utterance. It has been seen, ... that there is much opportunity for difference of opinion whether the proponent in the first instance must put in the whole. But there is and could be no difference of opinion as to the opponent's right, if a part only has been put in, himself to put in the remainder. [7 Wigmore, Evidence § 2113, at 653 (Chadbourn rev. 1978)].
*271 See State v. Boyer, 221 N.J. Super. 387, 398-99, 534 A.2d 744 (App.Div. 1987), certif. denied, 110 N.J. 299, 540 A.2d 1280 (1988).
In State v. Gomez, 246 N.J. Super. 209, 587 A.2d 272 (App. Div. 1991), the defendant had been interviewed in Nebraska about a murder that had been committed in New Jersey. At first he denied that he had ever visited or lived in this State. After several hours, he admitted that he had visited Atlantic City for a couple of weeks. An investigator then told him he was charged with murder and questioned him about that incident. Defendant stated that he had killed the victim accidently, in self-defense. At trial only the initial inculpatory statement in which he denied his New Jersey contact was admitted. The subsequent exculpatory statement was excluded. Defendant was convicted of murder.
We first rejected Gomez's assertion that the exculpatory portion of his statement should have been admitted pursuant to Evid.R. 63(10). We noted that "[t]he critical test is whether the statement ... exposes the declarant to criminal liability ...," and concluded that that portion clearly did not expose defendant to criminal liability. Id. at 215-16, 587 A.2d 272. We then considered defendant's claim that the doctrine of testimonial completeness required its admission observing: "The object of the rule is to permit the trier of the facts to have laid before it all that was said at the same time upon the same subject matter." Id. at 217, 587 A.2d 272. We employed the analytical framework outlined by Justice Clifford in his concurring and dissenting opinion in State v. Abrams, 72 N.J. 342, 370 A.2d 852 (1977). The issue is there stated as whether the trustworthiness ascribed to the admitted statement portion was transferable to the unadmitted portion, in which he exonerated himself. Id. at 343, 370 A.2d 852. We concluded in Gomez that because the initial statement had been introduced only because it was made by defendant and not because of its testimonial trustworthiness, there was "no reason to believe that defendant's later *272 tape recorded exculpatory account possessed these attributes." Gomez, 246 N.J. Super. at 219, 587 A.2d 272.
Federal authority provides some guidance for the application of this doctrine:
Under Fed.R.Evid. 106, when a party introduces a writing or part thereof, the opponent may require the other party to introduce any other part or writing "which ought in fairness to be considered contemporaneously with it." Under this doctrine of completeness, a second writing may be required to be read if it is necessary to (1) explain the admitted portion, (2) place the admitted portion in context, (3) avoid misleading the trier of fact, or (4) insure a fair and impartial understanding. [United States v. Sources, 736 F.2d 87, 91 (3d Cir.1984), cert. denied, 469 U.S. 1161, 105 S.Ct. 914, 83 L.Ed.2d 927 (1985)].
The determination of whether fairness requires the inclusion of the exculpatory portion of the statement and whether that portion carries with it a likelihood of trustworthiness rests in the sound discretion of the trial judge. See Abrams, 72 N.J. at 345, 370 A.2d 852. In the present case, there is no issue of trustworthiness of the initial portion of defendant's statement as it was merely a question he was asking of the investigator. In addition, there appeared to be little direct nexus between defendant's initial inquiry as to how much time he could get for the offense and his later exculpatory statement. Thus, the doctrine of completeness does not require the admission of the later statement for any legitimate purpose related to defendant's earlier statement. We find no abuse of discretion in the trial judge's exclusion of defendant's exculpatory statement.

III.
Defendant maintains that the discovery rules were violated during the course of the trial in that a "Bio-Chemical Analysis Questionnaire" which had been completed by the prosecutor's investigator had not been turned over in discovery and also because notes made by the State's hair and fiber expert while examining items seized from the crime scene were only turned over to the defense during the second trial.
*273 The "Bio-Chemical Analysis Questionnaire" noted the possible presence of cat saliva from the victim's pet cat on the evidence submitted for testing. Defense counsel first became aware of the State Police form when the prosecutor handed it to defense counsel during trial. The State Police senior forensic scientist testified that she didn't know "if there would be any certain effect" or "if that would affect our analysis." Defense counsel made a motion for mistrial, which the trial judge denied.
A prosecutor's investigator testified that he was familiar with the Bio-Chemical Analysis Questionnaire and that it was the policy of the State Police Lab to have one completed in every case. To the best of his recollection, he was the officer who completed the form, including the notation about cat saliva. His testimony was that the failure to include a copy of the form in the discovery given to defendant was inadvertent and not deliberate. There was no actual evidence of a saliva submission from the cat.
The second discovery problem arose during cross-examination of the State's hair and fiber expert when it was revealed that the expert had recorded observations in eleven pages of notes, not included in the report that was given to defense counsel. The prosecutor had only the top page on the notes. Although the prosecutor had given defense counsel a copy of everything he had, defense counsel again made a motion for mistrial. The motion was denied.
R. 3:13-3 imposes upon the State the duty generally to make disclosure of all material, including test results and reports, relating to the case. The duty to disclose is a continuing one, and if a party's failure to disclose is brought to the attention of the court, the court "may order such party to permit the discovery or inspection of materials not previously disclosed, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may enter such other order as it deems appropriate." R. 3:13-3(f). *274 The State has a duty to provide exculpatory evidence to the defense, even when that evidence is in the possession of the police. See State In Interest of L.E.W., 239 N.J. Super. 65, 75-77, 570 A.2d 1019 (App.Div.), certif. denied, 122 N.J. 144, 584 A.2d 216 (1990). Federal case law also mandates generally that full disclosure of all evidence material to the question of guilt be made to criminal defendants. See Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215, 218 (1963).
In State v. Carter, 91 N.J. 86, 449 A.2d 1280 (1982), our Supreme Court restated the standards of review applicable to the failure by the prosecution to turn over relevant evidence. The Court observed that there are three applicable levels of scrutiny when determining the materiality of prosecutorial non-disclosure. The Court stated:
In making the often difficult determination of what is "material" we look to the factual circumstances of the particular case. Where the prosecution has knowingly used perjured testimony, the undisclosed information is material if "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."
Where the defendant has made a specific request for information and the prosecution has failed to reveal the requested information, the standard of materiality is whether "the suppressed evidence might have affected the outcome of the trial."
Finally, when no request is made by the defendant or only a general request is made, information not revealed by the prosecutor will be considered material only if "the omitted evidence creates a reasonable doubt that did not otherwise exist...." [Id. at 112, 449 A.2d 1280 (citations omitted)].
Here, the defense made a specific request for the test results and lab reports. Therefore, the defense urges that the appropriate measure of materiality is whether the evidence "might have affected the outcome of the trial." Id. The reference to possible cat saliva contamination was concerned only with possible tainting of the blood samples taken from the bed. Even assuming that level of scrutiny, we nonetheless conclude that the evidence of these blood tests was no more than cumulative evidence when considered in light of all the other damaging evidence which the jury had before it.
*275 These blood tests were not likely to have affected the verdict, as cat hairs of the same type that were present on victim's T-shirt and pillow cases were found on defendant's sweatshirt and sweatpants, the victim's blood was on defendant's sweatshirt, and a hair found on victim's pillowcase was physically representative of defendant's pubic hair control specimen. Thus, even without the allegedly contaminated blood samples from the bed, forensic evidence, including untainted blood samples, indicated defendant was present at the scene of the crime.
We turn next to defendant's discovery challenge relating to the fact that he did not receive a copy of the notes made by the State's forensic expert. A criminal defendant is entitled to a copy of the report prepared by any expert witness expected to testify for the State at trial. See R. 3:13-3(a)(11). See also State v. Toro, 229 N.J. Super. 215, 551 A.2d 170 (App.Div. 1988), certif. denied, 118 N.J. 216, 570 A.2d 973 (1989), overruled on other grounds, State v. Velez, 119 N.J. 185, 574 A.2d 445 (1990). However, the breadth of discovery provided for by the Court Rules on a general demand does not include the expert's personal notes which are not in the prosecutor's file.
Defendant appears to acknowledge that an expert's notes are not required to be provided as part of general discovery under present law. He, however, requests that we impose a new duty to do so. We decline to grant relief here as it is unquestioned that the prosecutor had no knowledge of the additional notes and the expert's notes were ultimately made available to the defense at trial.

IV.
Defendant's assertion that the admission of defendant's clothes and the victim's T-shirt into evidence was improper because the State allegedly failed to show a reasonable probability that the evidence was not tampered with or to establish an uninterrupted chain of custody is clearly without merit. R. *276 2:11-3(e)(2). The discretion of the trial judge to determine whether the chain of possession of evidence has been sufficiently established "will not be overturned in the absence of a clearly mistaken exercise thereof." State v. Brown, 99 N.J. Super. 22, 27, 238 A.2d 482 (App.Div.), certif. denied, 51 N.J. 468, 242 A.2d 16 (1968). See State v. Farfalla, 113 N.J. Super. 557, 274 A.2d 601 (App.Div.), certif. denied, 58 N.J. 394, 277 A.2d 886 (1971). We find no error in admitting the evidence in question.

V.
Defendant argues that the trial judge erred when he found that there were insufficient grounds for a mistrial after the victim had made an angry outburst against defense counsel. The judge issued the following curative instructions to the jury:
I am sure that you all can understand that the witness, [the victim] now on the stand is upset in reciting the testimony that she has already given.
I told you a number of times and I will tell you again, you are the judges of the facts and you are entitled to hear all of the facts. All of the facts of this witness' testimony as well as all other witnesses. And that testimony consists of not only the direct-examination but cross-examination as well.
The facts will come to you through testimony and any other evidence that will be presented before you. You will be asked to deliberate finally in this case.
You heard the witness just before we recessed say that she believed the proceedings to be a game. A way to get the defendant off. I want you to understand and I will tell you now, that this is not a game. This is not a game being played by either side. The goal and I think I have told you this in my preliminary instructions, the goal here is to find a fair verdict. You can't do that until you have heard all of the relevant facts.
[Defense counsel] representing the defendant as well as [the prosecutor] representing the State has the right, the obligation to ask questions, to test every witness including [the victim].
I have told you before and I will tell you again, even without the recess, that you are not to allow sympathy, bias or pity or prejudice to affect your judgment in any manner.
The jury was then questioned by the court as follows:
Let me ask you now, Members of the Jury and you can raise your hand in response, the incident that occurred here in the courtroom just prior to the recess, would that affect any of you in any way in your ability to sit as a fair and impartial juror in this case? Any one who would be affected by that, would you please raise your hand?

*277 All right. Thank you.
"Generally, a motion for a mistrial should be granted only in those situations which would otherwise result in manifest injustice." State v. DiRienzo, 53 N.J. 360, 383, 251 A.2d 99 (1969). The trial judge here acted promptly and sufficiently under the circumstances. Defendant was not denied a fair trial.

VI.
We find no merit to defendant's contention that cumulative error requires reversal of his convictions under State v. Orecchio, 16 N.J. 125, 129, 106 A.2d 541 (1954). R. 2:11-3(e)(2).

VII.
On January 11, 1989, the trial judge presided over a bail revocation hearing for defendant. The State had moved to revoke defendant's bail after his former girlfriend, who was the mother of his son, filed a complaint alleging that he had assaulted her. The judge heard testimony of various witnesses and found that there were sufficient grounds to justify bail revocation. The trial judge at sentencing then considered the testimony presented at the bail revocation hearing and found that it justified the imposition of a harsher sentence on defendant's convictions arising from the retrial of this indictment.
Defendant challenges the increased sentence imposed on April 25, 1989 claiming that: the increased sentence was unconstitutional and barred by the "law of the case" doctrine; the trial court erred in failing to merge the conviction for burglary into the conviction for aggravated sexual assault during a burglary; the trial court erred in its findings as to aggravating and mitigating factors; and, the trial court erred in failing to allow credit for time served.
We find the judge's increase of the sentence to be unwarranted. In State v. Rodriguez, 97 N.J. 263, 478 A.2d 408 (1984), our Supreme Court recognized that a more severe sentence *278 on reconviction is not constitutionally barred provided events subsequent to the earlier sentence shed new light on legitimate sentencing considerations. See North Carolina v. Pearce, 395 U.S. 711, 723, 89 S.Ct. 2072, 2079, 23 L.Ed.2d 656, 668 (1969). We are not convinced that the aggravating factors initially applicable were sufficiently changed by defendant's involvement in the altercation with his paramour as related at the bail revocation hearing. This is particularly true in view of the constitutional implications of imposing a more severe sentence after reconviction when new factors do not clearly warrant an increased sentence. The sentencing judge's concerns with regard to the new offense are capable of being adequately dealt with in proceedings directly related to that incident.
Defendant's contention that the trial court should have merged his conviction for burglary into his conviction for aggravated sexual assault is clearly without merit. R. 2:11-3(e)(2); State v. Adams, 227 N.J. Super. 51, 58-67, 545 A.2d 798 (App.Div.), certif. denied, 113 N.J. 642, 552 A.2d 167 (1988). We note, however, that because defendant had not been previously sentenced on the burglary charge, it having been merged after his first conviction, the trial court credited him with time served only on the first count of the conviction for aggravated sexual assault. We are convinced that it is inappropriate to deny defendant credit on the burglary charge for the time he was incarcerated on the sentences imposed after his first trial. If the trial judge had not merged the burglary conviction after the initial trial, defendant would have earned credit against that sentence as the first sentencing judge undoubtedly would have run all of the sentences concurrently with each other.
Defendant's convictions are affirmed. Defendant's sentence is modified only to the extent that his conviction on count four is to run concurrently, rather than consecutively, with count one. Further, he is to receive credit against the burglary sentence in accordance with this opinion. We remand to the Law Division for amendment of the judgment.