**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3146-17T2

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

DARIUS D. BRIDGES, a/k/a
SIMMIE SANTANA,

     Defendant-Appellant.

_____

          Submitted March 20, 2019 – Decided July 18, 2019

          Before Judges Fuentes, Accurso and Moynihan.

          On appeal from the Superior Court of New Jersey, Law Division, Burlington County, Indictment No. 17-03-0317.

          Hegge & Confusione, LLC, attorneys for appellant (Michael James Confusione, of counsel and on the brief).

          Gurbir S. Grewal, Attorney General, attorney for respondent (Sarah C. Hunt, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

Defendant Darius Bridges appeals from his conviction by jury of, and sentencing for, first-degree murder, N.J.S.A. 2C:11-3(a)(1), (2) (count one); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1) (count two); and second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b)(1) (count four).[1]  On appeal, he argues:

> POINT I
>
> THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO EXCLUDE HIS STATEMENTS TO POLICE.
>
> POINT II
>
> THE TRIAL COURT ERRED IN ADMITTING EVIDENCE OF A PRIOR DRUG TRANSACTION AS "MOTIVE" EVIDENCE UNDER N.J.R.E. 404b.
>
> POINT III
>
> THE TRIAL COURT ERRED IN ALLOWING THE JURY TO HEAR OTHER BAD ACT EVIDENCE THAT SHOULD HAVE BEEN PRECLUDED PER N.J.R.E. 404b.
>
> POINT IV
>
> DEFENDANT WAS UNFAIRLY PREJUDICED BECAUSE A POLICE WITNESS TOLD THE JURY, DURING THE STATE'S CASE-IN-CHIEF, THAT

---

[1]  Defendant was found not guilty of second-degree unlawful possession of a handgun, N.J.S.A. 2C:29-5(b)(1) (count three).  Count four was tried separately pursuant to State v. Ragland, 105 N.J. 189 (1986).

DEFENDANT WAS TAKEN INTO POLICE CUSTODY ON UNRELATED CHARGES.

POINT V

THE TRIAL COURT ERRED IN FAILING TO SUA SPONTE CHARGE SELF-DEFENSE TO THE JURY.

POINT VI

DEFENDANT'S SENTENCE IS IMPROPER AND EXCESSIVE.

We are unpersuaded by any of these arguments and affirm; we remand only for the correction of the judgment of conviction to reflect the imposition of the mandatory thirty-year period of parole ineligibility on count one in accordance with N.J.S.A. 2C:11-3(b)(1).

The State offered proof at trial that defendant drove a 1999 Honda Accord to the intersection of York and East Federal Streets (the intersection) in Burlington City to sell drugs to Timothy Stevens. Stevens testified at trial that the murder-victim, Howard Young, known to defendant as How or Howie, crossed York Street and approached defendant and Stevens and told Stevens to "get out of [the area] because it was gonna be a problem there." Defendant told police detectives in a videotaped statement that Young warned defendant he was not allowed to sell drugs in Burlington City and that if defendant did not leave "he would get some smoke," meaning he would be shot. Young subsequently

went back across the street to a building on East Federal; Stevens and defendant returned to their respective vehicles and drove away. The exchange was captured on surveillance video. Defendant later viewed the video and identified the car he was driving – a Honda Accord – as his.

Approximately forty minutes later, a surveillance video camera captured a vehicle similar in color and style to defendant's Accord returning to the area. A male driver exited the vehicle, raised his sweatshirt hood and walked toward the intersection. When the male reached the intersection, he drew a handgun and fired in the direction of the building on East Federal to which Young returned after meeting with defendant and Stevens. Muzzle flashes are visible in the surveillance video. With the gun still in hand, the male ran back to the car and drove away. Surveillance footage from a different camera shows the victim repeatedly fall and get back up before reaching the side of the building on East Federal in which he is eventually found.

A resident of that building, Terrance Johnson, left his home shortly before the shooting. When he reached the intersection, he heard a man shout, "Yo, How" from across the street. Johnson turned to look at the man who had shouted and saw the "guy standing there, raise his arm and start firing . . . [a] gun." After Johnson heard seven shots, he ran across the street in the direction of the shooter.

A-3146-17T2

He observed the shooter jump in a black Nissan or a Kia with a spoiler and drive away "left to the corner and then right to [Route] 130."

While inside an auto-repair shop located a block-and-a-half away from the shooting, another witness, James Chambers, heard gunshots. Chambers ran to the front of the shop and observed a male run toward him from the direction of East Federal wearing all black and carrying a silver handgun in his hands. Chambers observed the male run to a 2000 black two-door Honda Accord or Prelude with a spoiler and turn right toward Route 130. Chambers, who did not see the shooter's face, called 9-1-1. Chambers identified the car in the surveillance video as the same car he observed the shooter get into after the shooting.

Upon returning to his home, Johnson observed Young lying on the floor with a gunshot wound to the right side of his back. Young later died from the bullet wound.

Davon Jones, who grew up with defendant in the City of Beverly, in Burlington County, later identified the male in the surveillance video as defendant "by his walk" and "[t]he way he carrie[d] his leg, like it's injured. So he got a little limp to it" – "like galloping." He also said the vehicle in the video was "associated" with defendant.

A Burlington City police detective went to defendant's home in Beverly the morning after the shooting and observed a car that matched that seen in the surveillance video; it had the same spoiler, sunroof and hubcap defect. He saw Deja Bullock-Jackson enter the vehicle and unsuccessfully attempt to move it. The detective seized the vehicle and had it towed to a secured garage at the Burlington County Prosecutor's Office (BCPO) where it was searched. Police found a utility bill bearing defendant's name and address and a photograph of defendant. Jackson-Bullock later admitted to a BCPO detective that defendant called her on the morning after the shooting and asked her to move his car from his home in Beverly; and that when she arrived at defendant's house, he gave her the car keys and they switched cellphones.

Kamiyah Hicks, the victim's cousin and an acquaintance of defendant, testified at trial that during a New Year's Eve party at defendant's house in Beverly, over a month after the shooting, she heard defendant say: "Smoking on a nigga Howie." Hicks took defendant's statement to mean that he shot Young. After hearing that statement, she started to cry and went upstairs. Defendant followed her and acknowledged that he "had words" with Young but told her he did not kill Young. Specifically, defendant told Hicks that Young said defendant could not sell drugs because he was not from Burlington, and that Young pulled

a gun on him which caused him to get scared and leave. Hicks provided a statement to police recounting the foregoing account a day later on January 2, 2017 and identified a picture of defendant.

Defendant was arrested on January 6, 2017 on an open warrant for unrelated charges in Beverly. The BCPO detective, with the Burlington City detective, took a video-recorded statement from defendant that day.

I

Defendant contends the trial court erred in admitting evidence of defendant's interrupted drug transaction with Stevens "as motive evidence" under Rule 404(b).[2] N.J.R.E. 404(b). Applying the four Cofield factors,[3] the trial court found the evidence

---

[2] Defendant did not contest the trial court's finding that the interrupted drug sale was intrinsic evidence. We, therefore, do not address that issue.

[3] In State v. Cofield, 127 N.J. 328 (1992) the Court held the admissibility of evidence under Rule 404(b) requires that:

> 1. The evidence of the other crime must be admissible as relevant to a material issue;
>
> 2. It must be similar in kind and reasonably close in time to the offense charged;
>
> 3. The evidence of the other crime must be clear and convincing; and

clearly relevant to motive as well as to opportunity, preparation, plan[ning] and identity. It is not similar to the crime charged but the second prong of Cofield is unnecessary to establish its admission under . . . Rule 404(b). The parties agree that such evidence is clear and convincing, obviating the need for the taking of testimony. The probative value substantially outweighs any prejudicial effect. Without such evidence the jury would be left without any explanation for the shooting, which is at the heart of the State's case. The defendant's drug involvement pales in comparison to the murder charge and will not be an obstacle to a fair trial. The [c]ourt will give the appropriate limiting instructions.

Contrary to defendant's contention in his merits brief that "there was not clear and convincing evidence that defendant had the alleged transaction or aborted transaction with Young," both defendant and Stevens provided evidence of the drug transaction which Young interrupted with his warning. In fact, as the trial court noted, the parties agreed that the evidence was so clear and convincing that "the need for the taking of testimony" at an evidentiary hearing

---

4. The probative value of the evidence must not be outweighed by its apparent prejudice.

[Id. at 338 (quoting Abraham P. Ordover, Balancing The Presumptions Of Guilt And Innocence: Rules 404(b), 608(b) And 609(a), 38 Emory L.J. 135, 160-61 (1989)).]

was obviated. The evidence established that Young's confrontation prevented defendant from selling drugs and threatened future consequences if he attempted to sell drugs in Burlington City, thus establishing a motive to shoot and kill Young. Evidence that defendant returned approximately forty-five minutes later with a gun, aimed it at Young and fired at him established that the shooting took place reasonably close in time to the interrupted drug transaction; and that defendant, knowing Young's location, planned, prepared and had the opportunity to shoot Young. The evidence relating to the car used in both the interrupted transaction and the shooting was relevant to prove defendant's involvement in both incidents. A review of the court's oral decision establishes it carefully weighed the prejudicial impact of that evidence against the probative value.[4] We note the court's conclusion is buttressed by defendant's willingness to tell the police about the drug transaction, evidencing that he too thought it paled in comparison to a homicide.

---

[4] Defendant concedes in his merits brief that, as to the similarity between the incidents, "[p]rong two does not apply." We agree. As the Court recognized in State v. Rose, 206 N.J. 141, 160 (2011), "Temporality and similarity of conduct is not always applicable, and thus not required in all cases." See also State v. Williams, 190 N.J. 114, 131 (2007) ("The requirement set forth as prong two of Cofield, however, is not one that can be found in the language of . . . Rule 404(b) . . . [and] need not receive universal application in Rule 404(b) disputes.").

Reviewing "the trial court's evidentiary rulings for abuse of discretion," State v. Gorthy, 226 N.J. 516, 539 (2016), we perceive none. To reverse the trial court's evidentiary ruling, we must find that the trial judge's decision was "so wide of the mark that a manifest denial of justice resulted." State v. Carter, 91 N.J. 86, 106 (1982). The trial court's ruling was on target. The evidence was properly admitted under Rule 404(b). And the judge's limiting instruction, both immediately after the evidence was presented and in the final charge, explained the purposes for which the evidence could and could not be used. State v. Garrison, 228 N.J. 182, 200 (2017) (noting that the court must give a limiting instruction when other-crimes evidence is admitted); see also Model Jury Charges (Criminal), "Proof Of Other Crimes, Wrongs, Or Acts (N.J.R.E. 404(b))" (rev. Sept. 12, 2016).

II

Defendant contends the trial court erred by denying his motion to suppress the videotaped statement he gave on January 6, 2017 because the detectives went beyond requests for pedigree information and elicited incriminating statements prior to administering Miranda[5] warnings. Defendant argues the remainder of defendant's statement should be suppressed because the detectives utilized a

---

[5] Miranda v. Arizona, 384 U.S. 436, 444 (1966).

"question-first, warn-later" interrogation technique. He also maintains that the State did not satisfy its burden that defendant knowingly, voluntarily and intelligently waived his <u>Miranda</u> rights.

Our standard of review of a trial court's decision on a motion to suppress requires our deference to the court's factual findings so long as they are "supported by sufficient credible evidence in the record." <u>State v. Gamble</u>, 218 N.J. 412, 424 (2014). The deferential standard applies to factual findings based on a video-recorded statement. <u>State v. S.S.</u>, 229 N.J. 360, 379-81 (2017). "By contrast, the task of appellate courts generally is limited to reviewing issues of law. Because legal issues do not implicate the fact-finding expertise of the trial courts, appellate courts construe the Constitution, statutes, and common law 'de novo—"with fresh eyes" . . . .'" <u>Id.</u> at 380 (quoting <u>State v. Morrison</u>, 227 N.J. 295, 308 (2016)). We need not defer to a trial judge's interpretive conclusions "unless persuaded by their reasoning." <u>Morrison</u>, 227 N.J. at 308.

Defendant met with the detectives after he was arrested on an unrelated warrant. Defendant, from the start, complained about the conduct of the Beverly police during the warrant execution. As noted by the BCPO detective who

conducted the interview,[6] defendant was "pissed off" – an emotion that continued and escalated during the interview although the detective reminded defendant that they did not take part in the warrant execution.

After offering defendant water and bantering about defendant's family and household, the detective asked defendant his date of birth and "what's a good . . . cell phone number for ya?"  The following colloquy ensued:

A:  I don't have a phone.

Q:  You don't have a phone.

A:  The cops took my phone, they tell you that. Homicide took my phone.  Where homicide at?

Q:  When did homicide take your –

A:  When they took my car.

Q:  Which car?

A:  My Honda.

Q:  Well, how do you know homicide took your car?

A:  'Cause, my little sister told me.

Q:  Your little sis –

A:  And my sister told me.

---

[6]  Although the Burlington City detective was present, we glean the substantive questions were asked by the BCPO detective.

A-3146-17T2

Q: Okay. All right. All right. Well, you're talkin' about homicide, you're talkin' about people taking your car, stuff like that.

A: Yeah, my car, I need my fuckin' car back.

Q: All right. Well, being that you're talkin', throwin' around the word homicide, talkin' about people taking your car. I don't exactly know what that is that you're gonna say, all right, and to protect you and to protect what I'm (inaudible) –

The detective then administered <u>Miranda</u> warnings to defendant.

<u>Miranda</u>'s protection extends only to acts of police officers "reasonably calculated to elicit an incriminating response." <u>State v. Bohuk</u>, 269 N.J. Super. 581, 594 (App. Div. 1994) (quoting <u>State v. Lozada</u>, 257 N.J. Super. 260, 268, (App. Div. 1992)). "To fall afoul of that rule, the defendant's statement must have been the product of police questioning or its functional equivalent." <u>Ibid.</u> Thus, interrogation under <u>Miranda</u> denotes questions, words or actions by the police that they "should know are reasonably likely to elicit an incriminating response from the suspect." <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301 (1980) (footnotes omitted).

"[B]ooking procedures and the routine questions associated [with that process] are ministerial in nature and beyond the right to remain silent." <u>Bohuk</u>, 269 N.J. Super. at 593 (second alteration in original) (quoting <u>State v. Mallozzi</u>,

246 N.J. Super. 509, 515 (App. Div. 1991)). "[U]nexpected incriminating statements made by in-custody defendants in response to non-investigative questions by the police without prior Miranda warnings are admissible." Mallozzi, 246 N.J. Super. at 515-16; see State v. Ward, 240 N.J. Super. 412, 419 (App. Div. 1990) ("[voluntarily blurted out] statements are . . . admissible without Miranda warnings.").

The detective could not have reasonably anticipated that defendant's response to a request for his phone number would be that "homicide" took his phone. The record is not clear if the detectives knew that defendant's phone was seized "by homicide." Defendant's question, "Where homicide at?" indicates he did not associate the detectives with the unit that seized his phone. Even if the detectives did know defendant's phone was seized, the detective asked for a current phone number, not one tied to defendant's seized phone. Moreover, defendant does not contend that the evidence against him included any cell phone information.

In his merits brief, defendant contends the questions "about defendant's cellular phone [were] then used as partial evidence tying defendant to the shooting in question." His only citation to that evidence in the trial record is the portion of defendant's statement in which he said "homicide" took his phone.

14

As it pointed out in its merits brief, the State "did not even elicit [during trial] that defendant's phone was recovered from his car."

Similarly, defendant blurted out that the phone was seized when "homicide" took his car. The detective asked only two questions after defendant made that statement: "Which car?" and "Well, how do you know homicide took your car?"

We recognize that the Burlington City detective seized defendant's vehicle. We do not, however, know if the BCPO detective knew that; the Burlington City detective did not disclose his actions during defendant's statement. The fact that the BCPO detective did not pursue questioning but immediately stopped the interview and administered Miranda warnings evidences that defendant's response was not anticipated. Defendant never placed his car at the murder scene.[7] Nor did the detective ask questions before Miranda warnings were given to elicit that information.

Even if the two questions and defendant's responses thereto are deemed to be violative of Miranda's tenets, the balance of defendant's post-Miranda warning statement was properly admitted. Where "Miranda warnings are given

---

[7] The surveillance footage, items seized from defendant's car and Bullock-Jackson's testimony linked defendant to the vehicle.

<u>after</u> a custodial interrogation has already produced incriminating statements," the totality-of-the-circumstances analysis factors to be considered include:

> (1) the extent of questioning and the nature of any admissions made by defendant before being informed of his <u>Miranda</u> rights; (2) the proximity in time and place between the pre- and post-warning questioning; (3) whether the same law enforcement officers conducted both the unwarned and warned interrogations; (4) whether the officers informed defendant that his pre-warning statements could not be used against him; and (5) the degree to which the post-warning questioning is a continuation of the pre-warning questioning.
>
> [<u>State v. O'Neill</u>, 193 N.J. 148, 180-81 (2007).]

The pre-warning questioning here was very brief, especially in contrast to the ninety-five minute questioning of the defendant in <u>O'Neill</u>. Likewise, the balance of the statement took less than two hours. As we noted, defendant's responses related only to ownership of the vehicle and did not implicate him directly in the homicide; they were not "damning admissions" as was the case in <u>O'Neill</u> where the defendant implicated himself in a robbery during the pre-warning interview. 193 N.J. at 179. Although the same detectives conducted the pre-warning questioning and the post-warning portion that immediately followed, and did not inform defendant that his pre-warning statements could not be used against him, we recognize the <u>O'Neill</u> factors are not applied

16

formulaically; the Court did not pronounce "a bright-line rule." O'Neill, 193 at 181. Considering the totality of the circumstances, the brief questioning and fairly innocuous pre-warning responses did not render the subsequent "Miranda warnings ineffective in providing . . . defendant the opportunity to exercise the privilege." Id. at 181-82.

A review of the entire statement reveals defendant was not at all intimidated by the detectives. Immediately after Miranda warnings were administered, he said, "I got nothin' to hide from y'all"; a statement he later echoed. When the detective asked defendant where his car was found, he sophisticatedly challenged, "I just told you, you wasn't listening to me[.] Or you just want to see if I'm gonna say the same thing over again?" Defendant's expletive-laced answers and overall demeanor during the colloquy reveal his lack of intimidation:

> Q: Okay. So you called, you said you called your sister but not Iyonna, a girl named Deja, right?
>
> A: Yeah.
>
> Q: All right. So –
>
> A: Y'all should know 'cause y'all, well, I don't know if you did but y'all should know, 'cause I'm not stupid 'cause y'all took her and was questioning her for that long too, which y'all shouldn't have been doin' 'cause she was a minor at the time, and you all told her not to

17

tell her mom and that was messed up what y'all did. Y'all wasn't supposed to do that. See, all cops are crazy, like I'm not stupid but I know the law and, I know the law and I know everything about it. So it was nothing, you could tell me about it, I (inaudible) not know, and you can try to switch up the story or try to think that I'm messing up. No, I'm not messing up no story, for one it's not a story, it's the truth and it's facts and I'm gonna repeat the same thing over again. If you want me to run it back already, right, run it back again I'll run the story back again and tell you the same fuckin' thing. But I'm not stupid, dawg. I'm gonna tell you that now. I'm not stupid. Just letting you know that now.

And defendant's ultimate diatribe-ending threat – "I'll beat the shit out [of] you too" – further evidences that the pre-warning portion of the interview in no way rendered the <u>Miranda</u> warnings ineffective.

Defendant was clearly in control of what he disclosed to the detectives. Defendant's challenges to the detectives belie that he was cowed by them. His comments reflect that he was capable of exercising his rights if he so chose. We defer to the trial court's finding, based on the record evidence and the court's analysis of the totality of the circumstances, <u>see</u> <u>State v. Knight</u>, 183 N.J. 449, 462-63 (2005), that defendant knowingly and intelligently waived his rights and gave his statement, substantially for the reasons set forth in the trial court's oral opinion.

We determine defendant's argument, relying on State v. A.G.D., 178 N.J. 56 (2003), that defendant's statement should have been suppressed because police did not advise defendant he was a suspect, to be without sufficient merit to warrant discussion.  R. 2:11-3(e)(2).  Neither a complaint nor warrant had been filed or issued against defendant in connection with the Young homicide. See A.G.D., 178 N.J. at 68-69.  And, as the trial court ruled, a valid waiver of Miranda rights was not dependent upon the police advising defendant he was a suspect.  See State v. Nyhammer, 197 N.J. 383, 407 (2009).

Nor do we perceive error in the admission of that interview-ending tirade during which defendant threatened the detectives.  Defendant did not object to the admission of that portion of the videotape and we do not conclude that its presentation to the jury was plain error "clearly capable of producing an unjust result."  R. 2:10-2.

Aware that the jurors would be instructed that, in determining whether defendant's statement was credible, they "should take into consideration the circumstances and facts as to how the statement was made as well as all the other evidence in the case relating to that issue," defense counsel argued in summation that defendant

> was interrogated by a very skilled, very well-trained detective.  You saw it.  He disarmed him.  He charmed

him. He promised him things. [Defendant] kept talking, kept talking, kept talking. At the end, his frustration bubbled up and he was a very unpleasant young man. And maybe, after having seen that, maybe you had a better understanding why there are so many rules about people that may be unsophisticated and not skilled in the law, in law enforcement, being given certain rights when they're being confronted, interrogated, by multiple police officers.

Counsel also told the jurors that defendant and the detective "got a little rough with each other a time or two, but you'll recall the detective cleverly kept him on the hook."

Defendant used the final portion of the statement to undermine that evidence. See State v. Alexander, 215 N.J. Super. 523, 528 (App. Div. 1987) ("In light of the understandable strategy of defense counsel . . . defendant cannot now complain on appeal."). The jury was fully instructed as to how to consider defendant's statement. The admission of and subsequent use of the final portion by defense counsel in summation does not raise the possibility of an unjust result "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." State v. Macon, 57 N.J. 325, 336 (1971). As such, no relief is warranted. Ibid.

III

20

Defendant argues he was denied a fair trial because the BCPO detective corrected a prior response to the assistant prosecutor's question about the date defendant was taken into custody for Young's homicide, and testified: "I make a correction on that, if I might. He was taken into custody on unrelated charges on January 6, 2016." Defense counsel objected at sidebar and moved for a mistrial; the court denied his application.

Our Supreme Court keenly recognized one of the pitfalls of a trial by jury is

> that inadmissible evidence frequently, often unavoidably, comes to the attention of the jury, and the record cannot be purged of all extraneous influence. Hence, it is axiomatic that "[n]ot every admission of inadmissible hearsay or other evidence can be considered to be reversible error . . . ; instances occur in almost every trial where inadmissible evidence creeps in, usually inadvertently."
>
> [State v. Winter, 96 N.J. 640, 646 (1984) (alterations in original) (quoting Bruton v. United States, 391 U.S. 123, 135 (1968))].

The Winter Court ruled that the decision to declare a mistrial or, instead, issue a curative instruction "is one that is peculiarly within the competence of the trial judge, who has the feel of the case and is best equipped to gauge the effect of a prejudicial comment on the jury in the overall setting." Id. at 647. We therefore defer to the trial court's determination. Ibid.

A-3146-17T2

The detective's mention of the unrelated arrest was inadvertent. Indeed, the assistant prosecutor had asked, "Was a gun ever recovered in this case?" when the detective uttered his correction to his previous answer. The objectionable testimony was not repeated or highlighted. Moreover, immediately after the sidebar was concluded, the court instructed the jury that the testimony about defendant's

> arrest is of no moment at all and cannot be considered by you in your deliberations for any purpose whatsoever. And the reason for that is: It's pretty simple, and I'm sure you figured it out already, the person was convicted of one crime then all you would have to do is say to fact finders such as yourself who are judges in this case, they've previously been convicted so they must have committed the crime charged. That's grossly unfair. We don't do that. You must ignore any mention of an arrest . . .

The instruction was repeated in the judge's final charge. The jury is presumed to have followed those instructions. State v. Smith, 212 N.J. 365, 409 (2012). The immediate and definitive instruction obviated the possibility that the fleeting remark would lead to an unjust verdict. Winter, 96 N.J. at 647. We are thus unpersuaded that a mistrial was required.

IV

We are also unpersuaded that the trial court erred when it did not sua sponte charge the jury on self-defense, a claim we review under the plain error

standard.  R. 2:10-2.  "A claim of deficiency in a jury charge to which no objection is interposed 'will not be considered unless it qualifies as plain error . . . .'"  State v. R.B., 183 N.J. 308, 321 (2005) (quoting State v. Hock, 54 N.J. 526, 538 (1969)).  In this context, "plain error requires demonstration of '[l]egal impropriety . . . prejudicially affecting the substantial rights of the defendant sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result.'"  State v. Burns, 192 N.J. 312, 341 (2007) (first alteration in original) (quoting State v. Jordan, 147 N.J. 409, 422 (1997)).  Defendant's failure to pose an objection to the jury instructions "constitutes strong evidence that the error belatedly raised . . . was actually of no moment."  State v. White, 326 N.J. Super. 304, 315 (App. Div. 1999).

"[A] trial court's duty to charge the jury on its own motion is one that is not self-executing, and that duty arises only when the record evidence clearly indicates the need for or clearly warrants the unrequested jury instruction."  State v. Rivera, 205 N.J. 472, 489 (2011).  "[T]he charge should be delivered to the jury only when there is 'obvious record support for such [a] charge . . . .'"  State v. Funderburg, 225 N.J. 66, 81 (2016) (second and third alterations in original) (quoting State v. Powell, 84 N.J. 305, 319 (1980)).

The record does not support the need for the charge. Defendant avers self-defense was raised by his statement that Young threatened he was going to "get some smoke" and that Young "kept clutching on his gun." Stevens, who was present during that encounter, testified that Young did not have a gun. The fact that defendant left the area after that encounter and returned with a handgun negates the need for the instruction. The use of deadly force was not justifiable under those circumstances because defendant knew he could "avoid the necessity of using [deadly] force with complete safety by retreating," N.J.S.A. 2C:3-4(b)(2)(b); defendant, in fact, did leave the area unharmed after Young allegedly threatened him with a gun.

We are not persuaded by defendant's arguments that other evidence also warranted the self-defense instruction. The BCPO detective's suggestion to defendant during his interview that Young may have shot first was not evidence, only an investigative technique. As the detective testified, that suggestion was never borne out by the investigation. Moreover, when the detective told defendant that he knew Young "probably shot first," defendant said, "I don't know what you're talking about 'cause that wasn't me. You got the wrong guy." The detective testified that defendant supplied the only information disclosed during the investigation that Young had a gun. Nor, as defendant contends, did

the spent casings at the scene that did not match the bullets that killed Young present sufficient evidence to warrant the instruction. Those casings were not linked to any gun, much less one in Young's possession. Defendant also contends that the assistant prosecutor's comments in summation – that the surveillance video did not show muzzle flashes from the area where Young was located and that evidence shows that Young was not shooting because he was shot in the back – presented sufficient evidence to warrant a self-defense charge. But the prosecutor's comments are not evidence. Further, the comments do not support self-defense; they rebut that defense.

We also note that an unrequested self-defense charge may have undermined defendant's stated trial defense: he was not present during the homicide. In a case where the defendant also denied presence at or participation in a homicide, our Supreme Court cautioned that a self-defense charge, even if appropriate, "would have been directly contrary to defendant's position at trial, could have prejudiced his chances of being acquitted of knowing murder by emphasizing his presence at the murder scene, and would have forced counsel to have foresaken or altered his chosen strategy." State v. Perry, 124 N.J. 128, 163 (1991). Appellate review, the Court said, "must be 'seasoned by a degree

of deference to defense counsel's strategic decisions.'" Ibid. (quoting State v. Marshall, 123 N.J. 1, 92 (1991)).

Under the circumstances, we are convinced the trial court did not err when it did not, unbidden, charge self-defense.

V

Defendant generally argues the trial court "failed to sufficiently justify the life imprisonment sentence imposed on defendant for" murder. He does not, however, challenge the trial court's finding: aggravating factors three, six and nine, N.J.S.A. 2C:44-1(a)(3), (6), (9), outweighed the non-existent mitigating factors.

Reviewing the trial court's sentencing determinations with a deferential standard, see State v. O'Donnell, 117 N.J. 210, 215 (1989), we discern no reason to disturb the trial court's sentence. The trial court followed the sentencing guidelines; the aggravating and mitigating factors found by the trial judge were supported by the evidence; and the judge's conclusion was reasonably made upon weighing the aggravating and mitigating factors and after applying the sentencing guidelines to the relevant facts. State v. Roth, 95 N.J. 334, 364-65 (1984).

26

The trial court noted defendant's lengthy juvenile and adult criminal record and found it showed "a blatant disregard for the law . . . [and] the rights of others." Based on the record, the court determined that defendant "ha[d] committed himself to a career of violating the law." Considering defendant's age – twenty-eight – and the number of transgressions he committed, the court concluded, "It's hard to believe that anything is going to change." The court's findings regarding the three aggravating factors are thus supported by the record. Under the deferential standard accorded the trial court's sentence, the facts and law do not show "such a clear error of judgment that it shocks the judicial conscience" requiring that we modify the sentence. Id. at 363-64.

We do note that although the trial court included in the judgment of conviction the parole ineligibility period required under the No Early Release Act, N.J.S.A. 2C:43-7.2(b), it did not include the shorter mandatory thirty-year parole ineligibility period under N.J.S.A. 2C:11-3(b)(1). As such, although we otherwise affirm defendant's conviction, we are constrained to remand this matter only for entry of an amended judgment of conviction that includes that thirty-year period; we do not require a resentencing. We do not retain jurisdiction.

Affirmed; remanded only for correction of the judgment of conviction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

27

A-3146-17T2