**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1623-20

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

v.

RYAN KEOGH,
CINDY KEOGH,
and DAVID KEOGH,

    Defendants-Respondents.

_____

Submitted June 3, 2021 – Decided July 22, 2021

Before Judges Ostrer, Accurso and Enright.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Somerset County, Indictment No. 19-05-0288.

Michael H. Robertson, Somerset County Prosecutor, attorney for appellant (Paul H. Heinzel, Assistant Prosecutor, of counsel and on the brief).

Respondents have not filed a brief.

PER CURIAM

We granted the State's motion for leave to appeal a December 11, 2020 order reversing a prior order to sever the murder trial of defendant Ryan Keogh from the trials of his parents, defendants David Keogh and Cindy Keogh, indicted for failure to aid an injured person, hindering, and the allegedly false statements they made to police about what they did in the nearly two hours between the fatal shooting of Terrence Coulanges and Cindy Keogh's 911 call reporting it. We reverse.

Defendant Ryan Keogh, twenty-eight at the time of these events, and Terrence Coulanges, twenty-nine, had known one another since they were teenagers. The two had at one point been aspiring rappers, and Coulanges had lived with the Keoghs for two years or more before they had a falling out in 2017.

Coulanges' family told police he had been living with them until mid-December 2018. He apparently left the state at that point, returning a few weeks later in early January 2019. Coulanges' sister told police her brother had been upset, irrational and impulsive on his return, and that her parents did not want him living at their house. Coulanges' parents confirmed that, and told police their son claimed he still had a laptop and some clothes at the Keoghs, which he had tried to retrieve several months earlier, but no one would answer the door.

2

Police learned more about Coulanges in the days before his death from another friend, Yasmine Garcia, who told them he was a recovering drug addict. She also told them Coulanges had been prescribed medication for psychiatric problems but had stopped taking it a year before because of the side effects. Coulanges had been staying with her since she picked him up at the airport a week before the shooting.

On the day of Coulanges' death, January 9, 2019, Garcia and another friend, Brian Morris, dropped Coulanges on the Keoghs' street in Bound Brook sometime between 5:30 and 6:30 p.m. Coulanges was apparently irritated because he had wanted to be dropped off earlier, but had forgotten his cellphone, causing the group, which had already made stops in Edison and Plainfield, to drive back to Plainsboro to retrieve it. Garcia told police that Coulanges wanted to get some clothes from "this guy," and said he would be an hour or two. The police confirmed her account with Morris, also a friend of Coulanges, who told them Coulanges had been mumbling to himself on the drive to Bound Brook. After dropping Coulanges, Morris and Garcia went on to a motel in Bridgewater, where Garcia's boyfriend was staying, to await Coulanges' call to pick him up.

Cindy Keogh called 911 at 7:36 p.m. to report that Ryan had shot an intruder who had come to the house armed with a gun and threatened him. In

A-1623-20

her statement to police later that evening, she claimed Ryan called her a few minutes before 6 p.m., telling her to come home right away. Claiming she was "way up past like Berkeley Heights" when she got the call, she told police it took her "a while" to get there. When she did, she met Ryan in the driveway, who told her "Terrence" had come to "the studio," a converted garage at the end of their driveway, "banging on the door," and "acting crazy"; that Terrence "said he had a gun, he pulled it"; that the two had struggled and that Ryan had gotten hold of the gun and shot Terrence twice.

She claimed she walked toward the studio and saw Coulanges lying on the deck outside the door, not moving. Asked whether Coulanges was dead when she arrived, she claimed she "didn't get close enough to see." She told police she didn't go closer because she had "issues with the young man." She explained that Coulanges had lived with the family for several years, that she "treated him like a son," and after he left them, she "heard a lot of things after the fact . . . that he said about [her] and [her] husband." She also told police Coulanges had come to the house twice in the past few months banging on the front door saying he'd left some belongings there and wanted them back, and once had come around to the back door and she "[thought] he said he had a gun."

4

Cindy claimed that when she arrived home and saw Coulanges lying on the deck in front of the studio, she called her husband, David, and then 911. She estimated she had arrived home shortly before her 911 call, which she put, after looking at her phone, at 7:32 p.m.

In his statement to police, David Keogh claimed he was in his office when his wife called him to tell him there was an emergency, and he needed to come home immediately. He did not know the time. David explained his office was only seven minutes away, and he left there as soon as he got the call. He claimed when he got home, he could "see the body" in front of the studio, but "didn't go close." David claimed he "didn't want to go, I'm not good at these things." Cindy told him he needed to call the police. Cindy then called the police, and he took Ryan into the house to await their arrival. David claimed he and Ryan "really didn't like have any conversation" while they waited. He asked Ryan what happened, and Ryan "just told [David] that [Coulanges] came after [Ryan] with a gun and he shot him."

David told police there was "a history" between Coulanges and Ryan. He explained that Coulanges had lived with them for some time until he went missing for several days and ended up in a hospital being committed for a mental

5

evaluation.  David said Coulanges came over when he was released "and like apologized and all that, and that's when he moved out."

Asked about the "history" between Coulanges and Ryan, David explained the two "were very close at times and then very you know . . . ."  David reported Ryan and Coulanges had gotten into some physical altercations when Coulanges was living with them, requiring David to once get between them, which caused Coulanges to "kinda [go] at [him] a little bit."  David also related "um . . . and I'm sure they told you this . . . [Coulanges] in recent months has come back to the house a couple of times."

David recounted that on  Coulanges' first time back, only he and Ryan had been home.  He claimed Coulanges rang the doorbell and David and Ryan looked out a bedroom window, saw it was Coulanges and did not open the door.  David said Ryan "was like leave him.  I don't . . . want any trouble."  David estimated Coulanges remained at the front door "probably like 45 minutes, an hour, and like knocked on the door and stuff."  David reported that Coulanges had come back more recently "and the same thing" happened.

According to David, Coulanges on this second occasion "rang the doorbell [and] knocked on the front door," which the family "ignored" because Ryan said "just leave it alone.  I don't want any trouble."  David claimed he and Cindy

6

"were respectful of that," and then Coulanges came around and started pounding on the back door. According to David, Ryan opened the door and told Coulanges they "didn't want any trouble," after which Coulanges "started mouthing off." David claimed he "noticed, which kind of freaked [him] out a little bit" that Coulanges "was keeping his hands" in the front pockets of his "hoodie," causing David to think "like does he have a gun or something." David said Coulanges didn't say he had a gun and "didn't pull a gun or anything." He elaborated:

> [Coulanges] said something and Ryan said did you catch this or something like don't jump the gun or something gun. And I, and afterwards I was Ryan, yeah I heard gun but I, in what context I, you know he didn't say like I got a gun, I'm gonna shoot you but. Then afterwards I said to Ryan yeah you know as a matter of fact I noticed how he was like holding his hands in the jacket. And I was like you know worried if you know, so that's when I was just like you know get off the property you know, get outta here.

David told police he was concerned because that was "twice in like a four month period [Coulanges] came back to the house and was you know trying to be confrontational." Asked why he didn't call the police, David said "my son didn't want that." He explained Ryan "has a big heart" and didn't want Coulanges "to like get back in trouble with . . . the law . . . for something like that."

7

Ryan gave two statements to the police that evening.  Before the detectives could finish providing him with Miranda[1] warnings prior to his first statement, Ryan was already telling them that Coulanges "was always homeless," with "nowhere to go," that Ryan "always took him in," that the two "had problems," that Coulanges "had had altercations with [Ryan's] father" and "threatened [Ryan]," and that Coulanges "showed up at the house in a threatening manner several times."  When the police completed the warnings and followed up with some background questions, Ryan told them the last time Coulanges appeared at the Keoghs, the prior October, he "right away started talking about a gun," and "kept fidgeting with his [hand]" in a way Ryan's "father noticed . . . too," prompting his father to ask Coulanges "why do you keep putting your hand in your pocket?"  Ryan said it was after his father's question that Coulanges "mentioned something about a gun."

As to the shooting, Ryan claimed that Coulanges just appeared at the studio after dark and started banging on the door.  Ryan said he asked Coulanges what he wanted, and Coulanges replied that Ryan "need[ed] to come outside," saying, "We need to handle this."  Ryan told the detectives that as soon as he opened the door, Coulanges "started pulling a gun, and [they] got into a

---

[1]  Miranda v. Arizona, 384 U.S. 436 (1966).

wrestling match and, um, [Ryan] got [his] hand on the gun and [he] . . . fired twice just out of instinct."

Ryan told police he "just had a bad feeling" that Coulanges "was about to attack [him]" in the weeks leading up to the shooting. Ryan claimed Coulanges had "threatened [him] several times," and that even in the years in which they were friends, Coulanges "would always talk about weapons and guns" and told Ryan "you know if we have an issue, it'll go to guns." Ryan claimed it was Coulanges' last visit when both he and his parents were at home that made him "already" know on the night of the shooting that Coulanges was going for a gun when he "saw him pulling something out of his pocket."

According to Ryan, when the family did not answer the door the last time Coulanges came to the house, he walked through a gate into the backyard and started banging on the back door. Ryan claimed Coulanges "said something about a gun and it was in a threatening way." Ryan told the police he asked Coulanges "why you showing up here talking about a gun? Like what's the point of that?" Ryan told police Coulanges finally left after being ordered off the property but not before telling Ryan "I'm gonna deal with you, . . . something along the lines of that." Ryan claimed Coulanges "had bad intentions for me and my family."

A-1623-20

Ryan could not tell police what the source of Coulanges' anger toward him was, "[j]ust . . . he was full of animosity, he just always had a problem with me." He claimed Coulanges had always been "kind of homeless" and "had a lot of issues" and that he'd "always helped this guy out." Ryan claimed his mother and father "were like parents to this guy and he continuously disrespected us, he stole from us, he threatened both my parents and myself on numerous occasions." According to Ryan, the rupture in their friendship had occurred two years before when Coulanges went missing from their home for several days. Ryan claimed when Coulanges returned, "he continuously lied, he stole from me. I parted ways with him. I didn't want anything to do with him," but "he kept showing up."

He told the detectives that after he grabbed the gun out of Coulanges' hand and "instinctively fired two shots," Coulanges fell to the ground, after which Ryan removed the gun's magazine, threw it on the deck, went back inside, locked the door and called his mother. Asked about the time, Ryan replied it all happened "[a]round 6 o'clock." He also told the detectives he called his mother again a few minutes later "[t]o see where she was." Ryan claimed he did not tell her what had happened either time, only that it was an emergency, and to please come home.

10

A-1623-20

Ryan estimated his mother arrived within fifteen or twenty minutes of his call. When she got there, he met her in the driveway, saying "It was self-defense mom. I didn't want this to happen. I was protecting us." He said his mother "knew the whole situation." Ryan claimed she had known "for a while this . . . guy was dangerous. This guy was a real threat to me and my family."

Ryan told police his mother immediately called his father, who arrived in twenty minutes to a half-an-hour. As soon as his father arrived, "he said, you know, you gotta report this," and his mother called 911. When asked why it took so long for them to make the 911 call, Ryan said he "panicked" and "didn't call [his] mother right away." He claimed he was in the house "trying to figure out what to do," and "sat down for a little while" and watched "baseball to try to get [his] mind off what [he] just did 'cause [he] didn't know what to do."

Once they had completed canvassing the neighbors, the detectives returned to query Ryan about the timeline again. After administering fresh Miranda warnings, they pressed Ryan about the length of time between his call to his mother and her arrival, and his claim that he hadn't told her what happened before she got home. Specifically, the detectives noted that Ryan and his parents "seem to have [had] ample enough time to possibly get a story straight." Ryan replied, "It might appear that way but that's not what happened." He claimed

11

the delay "wasn't a matter of us getting a story together, it was just a matter of me pacing around and just being really upset." Ryan explained "right away everything started rushing through [his] head that, what this is gonna do to [his parents]" and he "didn't want to, I don't know, make any mistakes or you know it wasn't a matter of us getting a story together, it was just a matter of me pacing around and just being really upset."

When police asked Ryan why he'd shot Coulanges after he disarmed him, Ryan replied, "it was instincts. And he had told me before that he would kill me and I just felt threatened. I really felt, somebody showing up[,] on in[,] on your property with a gun is, I felt threatened."

The State asserts that video from a neighbor's security camera and geolocation tracking of defendants' cell phones revealed their statements to police on the night of the shooting were false. Specifically, one of the Keoghs' neighbors wrote down she heard shots fired at 5:45 p.m. Ryan first called his mother at 5:46 p.m. Her cell phone puts her in the vicinity of her home at the time, not "way up past . . . Berkeley Heights" as she told police.

According to the State, the neighbor's video shows Cindy Keogh entering her driveway in an SUV at 5:54 p.m., eight minutes after Ryan's first call to her. The same video shows Cindy pulling out of the driveway in the SUV a minute

later at 5:55 p.m.  She returns in the SUV at 6:06 p.m., appearing to back down the driveway to the studio, and departs again at 6:20 p.m.  The State asserts that after leaving her home at 6:20 p.m., Cindy drove to her husband's office in Green Brook, arriving at 6:35 p.m.

The State claims Cindy's cell phone shows she left David's office ten minutes later, at 6:45.  The neighbor's security footage shows a sedan pulling into the Keoghs' driveway at 6:52, presumably the family's Honda Accord, which the State asserts Cindy was driving based on her cell phone tracking.  At 6:58, David pulled into the driveway in the SUV previously driven by Cindy.  All three of the Keoghs' cell phones put them on the property at that time.  A minute later, at 6:59 p.m., the neighbor's security footage shows both the sedan and the SUV pulling out of the driveway.  Geolocation data reveals the same, with all three arriving at David's office between 7:06 and 7:13 p.m.

The same geolocation data puts all three Keoghs' phones at their home in Bound Brook at 7:24.  Cindy called David on her cell phone at 7:25 p.m., although the tracking data puts them both at their home at the time.  She used the same cell phone to call 911 at 7:36 p.m.  The neighbor's video shows police pulling into the Keoghs' driveway at 7:37 p.m.  Coulanges was still warm when

13

police arrived, and seeing mucous at his nose and mouth, officers started CPR. Coulanges was pronounced dead at the hospital a little after 8 p.m.

Police also discovered that before handing his cell phone over to police on the night of the shooting, Ryan apparently deleted two calls he made earlier in the evening to a friend, Otto Bowens. Both calls had been placed at 6:08 p.m., after Cindy had arrived home the second time, one for six seconds and the other for about five-and-a-half minutes. Bowens knew both Ryan and Coulanges. Bowens told police Ryan had called in a panic to say he'd just shot Coulanges in self-defense. Bowens also told police he'd given Ryan a black semi-automatic handgun, like the one used to shoot Coulanges, about a year before the shooting.

A tap placed on Ryan's cell phone revealed a call from Ryan to Bowens, almost three weeks after the shooting, on the same day the police interviewed Bowens. In that call, Bowens told Ryan the police had just been to see him, and that "[t]hey knew you got that gun from me." Ryan responded by asking Bowens, "What are you talking about?" Bowens replies, asking "Yo, didn't you hear what I said, [expletive]?" Ryan asks "How?" and then quickly says "Wait,

14

first of all, you called me on this phone, call me on the other phone."[2]  As a result of that intercept, the police concluded Ryan had not been truthful when he told them the cell phone he turned over to them following the shooting was the only one he maintained.  Police eventually found eighteen other calls or texts between Ryan and Bowens on "the other phone."

The State charged all three Keoghs in a single indictment.  Ryan is charged with first-degree murder, N.J.S.A. 2C:11–3(a)(1) and (2) (count one), second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39–4(a)(1) (count two), third-degree hindering apprehension or prosecution, N.J.S.A. 2C:29–3(b)(4) (count three), third-degree endangering an injured victim, N.J.S.A. 2C:12–1.2(a) (count four), fourth-degree false swearing, N.J.S.A.

---

[2]  The trial court has apparently ruled that telephone conversation and Bowens' statement about previously providing a handgun to Ryan may not be introduced at Ryan's murder trial pursuant to N.J.R.E. 404(b), but may be introduced to prove the false swearing, hindering and tampering counts in the event those charges are severed.  In its brief, the State claims it intends to move for reconsideration of that ruling, contending "it proceeded on a misunderstanding of the relevant timeline and an incomplete appreciation of the evidence."  As that issue is not before us now, we express no opinion on the correctness of the ruling.  We include it because it assists in providing a fuller picture of the facts the State gathered in its investigation of this fatal shooting and the prejudice the State claims it will suffer if forced to try these defendants together.

A-1623-20

2C:28–2(a) (counts five through nine),[3] fourth-degree tampering with physical evidence, N.J.S.A. 2C:28–6(1) (count ten), and fourth-degree unlawful possession of a large capacity ammunition magazine, N.J.S.A. 2C:39–3(j) (count eleven).[4]

David Keogh is charged with fourth-degree hindering apprehension, N.J.S.A. 2C:29–3(a)(7) (count twelve), fourth-degree false swearing, N.J.S.A. 2C:28–2(a) (counts thirteen and fourteen), and third-degree endangering an injured victim, N.J.S.A. 2C:12–1.2(a) (count fifteen).[5] Cindy Keogh is charged with fourth-degree hindering apprehension, N.J.S.A. 2C:29–3(a)(7) (count twelve), third-degree endangering an injured victim, N.J.S.A. 2C:12–1.2(a)

---

[3] The State charges Ryan made five false statements during his two interviews with the police on the night of the shooting: 1) he was at his home from the time of the shooting until police arrived (count five); 2) Coulanges brought the handgun to the Keoghs' home (count six); 3) Ryan was aiming low when he shot Coulanges (count seven); 4) Coulanges reached into his pocket and pulled out a handgun before he was shot (count eight); and 5) Ryan was not familiar with the handgun he used to shoot Coulanges.

[4] In addition to the .9 millimeter semiautomatic pistol used to kill Coulanges, the police found a seventeen-round magazine on the deck near his body.

[5] The State charges David made two false statements in his interview with police on the night of the shooting: 1) that he was in his office when Cindy called him on his cell phone to come home (count thirteen); and 2) he only saw Cindy and Ryan together at their home between the time of the shooting and the arrival of the police.

(count fifteen), and fourth-degree false swearing, N.J.S.A. 2C:28–2(a) (counts sixteen through nineteen).[6]

Although charging the three together in one indictment, the State at some point thought better of trying them together in light of the Bruton[7] issues raised by the necessity of introducing their statements in its case to prove the false swearing counts. Accordingly, it moved under Rule 3:15-2(a) and State v. Young, 46 N.J. 152, 158-59 (1965), to sever their trials. The first judge to handle the matter agreed "the statements cannot be effectively deleted" and granted the State's motion to sever Ryan's trial from that of his parents. See Young, 46 N.J. at 159 (directing judges to order separate trials on the State's pre-trial motion if

---

[6] The State charges Cindy made four false statements in her interview with police on the night of the shooting: 1) that, following the shooting, she remained at her home between the time she arrived there in response to the two calls from Ryan until the police arrived (count sixteen); 2) she first spoke to David after the shooting by calling him in his office on her cell phone (count seventeen); 3) she was "way up past" Berkeley Heights when Ryan called her after shooting Coulanges (count eighteen); and 4) she did not arrive home until approximately 7:30 p.m. on the night of the shooting (count nineteen).

[7] Bruton v. United States, 391 U.S. 123 (1968) (reversing a defendant's conviction because his Sixth Amendment right to confront his accuser was denied when the government offered an out-of-court confession of a non-testifying co-defendant that inculpated the defendant). Where redaction of the inculpating confession is not feasible, courts may sever the defendants' trials to avoid the so-called "Bruton problem" that using the inculpating out-of-court confession would create. See State v. Corsi, 86 N.J. 172, 176-77 (1981) (describing severance and other options to avoid Bruton issue).

there cannot be "an effective deletion [from a defendant's statement] of all references to the codefendants without prejudice to the confessing defendant"). Ryan did not oppose that motion. Although neither Cindy nor David filed opposition either, they advised the court at a conference that they objected to severance and the court reserved on the issue as to them "until submissions."

That severance order was entered in February 2020. At the end of the court term, the judge moved to the Civil Division, and the case was reassigned to a new judge. In July, Ryan moved to rejoin his trial with that of his parents. Defendants represented they would waive any Bruton issues, and thus re-joinder would be appropriate under State v. Buonadonna, 122 N.J. 22, 39 (1991) (holding that "[a]lthough the right to confront witnesses and the derivative right secured by Bruton to have separate trials are constitutionally based," they can be waived by defense counsel following consultation with the defendant).

Ryan's counsel argued that waiver of the Bruton issues removed any constitutional impediment to trying the cases together, making the judicial economy of a joint trial paramount. He also argued the State's claim of prejudice was overblown. Counsel noted the State "has continuously asserted that these statements . . . are lies . . . . And the State can prove that they are lies." "So," he submitted, "if we are asking for a joint trial where [the prosecutor] is going

18

to be able to prove that we are all lying, doesn't it seem that we are the ones committing suicide-by-lawyer? And if that's what it is, . . . we are doing it because that's our request to the court."

Noting it was the State's decision to charge the family in one indictment, counsel argued the State would not be successful in limiting admission of defendants' statements to only those parts it contends indicate guilt, thereby precluding introduction of those parts defendants contend "buttress[] innocence." He asserted that "whether it is a joint trial or a severed trial," the prosecutor's "chosen redactions to certain statements may be refuted or objected to by the defense anyway under the doctrine of completeness."

Cindy Keogh's counsel noted the State was focused on defendants' statements about the "prior incidents" of Coulanges "coming to the house" and suggested it might "make[] sense for the court to make a ruling on that." Counsel argued it was "kind of naïve to pretend" that "in a self-defense case, where this defendant has personal, actual knowledge of the victim's prior violent behavior," that the information "is not coming in." She argued that "Bruton is a shield for defendants. It is not a sword for the State to circumvent hearsay and pick and choose when and where they want to play certain portions of that statement." She concluded "'[i]t is the defendant's right and we are prepared to waive it."

David Keogh's counsel stressed that counsel's waiver made the decision of joint or several trials "no longer an issue of constitutional dimension," making the State's concern only one of hearsay. He argued if the State is introducing the elder Keoghs' statements "and there happens to be some exculpatory information in there regarding Ryan Keogh, it is the State playing it." The State would not be offering the information for its truth, and thus "[i]t is not hearsay. It is not evidence." Counsel contended the court "could always fashion a jury instruction" directing jurors in the limited use they could make of the information and advise defense counsel they were not permitted to argue that David's and Cindy's accounts of Coulanges' recent visits to the Keogh home bolstered Ryan's credibility.

Both Cindy and David joined in Ryan's argument that the delays engendered by the COVID-19 pandemic gave greater force to the need for judicial economy, meaning "if it is something that can be accomplished jointly then, obviously, it should be done jointly." Counsel also argued that as "a court of equity," the judge should consider the elder Keoghs' interest "in being in a courtroom with their son," "who is going to be on trial for murder . . . and facing the rest of his natural life in prison."

The State opposed the motion, contending <u>Buonadonna</u> dealt with a situation in which both the State and defendant were in favor of a joint trial, and the case provided no authority for compelling a joint trial over the State's objection that a joint trial would prejudice the prosecution. Specifically, the State argued defendants' decision to waive the <u>Bruton</u> issues in a joint trial was a patently strategic move designed to buttress Ryan Keogh's case that he shot Coulanges in self-defense with Coulanges' gun, and that this was not the first time Coulanges had threatened him or brought a gun to the Keoghs' home.

The State contended it was clear from the arguments of defense counsel that defendants sought to use one another's statements to advance their defense in a "sort of reverse <u>Bruton</u> strategy." The State maintained defendants planned to use the State's need to admit portions of their statements to prove the false swearing counts to get otherwise inadmissible, exculpatory hearsay before the jury under the completeness doctrine, thereby bolstering Ryan's defense with his parents' statements without necessarily exposing them to cross-examination. The State argued the jury would be unable to follow an instruction to disregard co-defendants' statements when weighing each defendant's guilt or innocence with so much cross-exculpatory hearsay "saturating the record" in a joint trial.

21

The judge reserved, saying he thought it was "important to author a written decision" on the issue. No written decision, however, was forthcoming. Instead, the judge entertained additional argument three months later and placed a decision on the record granting the reconsideration motion and ordering defendants tried together.

After recapping the parties' positions, including defendants' agreement to waive any Bruton issues in a joint trial and the State's claim of prejudice "under the logic of Bruton," the judge noted that most of the "reported cases discuss prejudice to the defendant in a joinder situation. It is rare to find a case that discusses prejudice to the State." Focusing on the State's concern that defendants were using the motion to launch "a trial strategy" to enable them "to get things into evidence before the jury that they otherwise wouldn't," the judge found he needed "to balance a very important tension here and that is the right of a defendant to testify at trial or to remain silent."[8]

Specifically, the judge stated his understanding of the State's concern "in layman's terms" would be that defendants "get all the statements in [and there] would be prejudicial information in there. And [the State] wouldn't have the

---

[8]  The judge did not say more on this point, and we cannot discern from his statements why that concern would be different whether defendants were tried together or separately.

right to attack that on cross examination if the defendant chose not to testify." The judge noted that defendants "may testify at trial" or "[t]hey may not," and that no one "will know that until the State rests its case. . . . [b]ut [what] the court has to analyze today is the law of joinder, and it is clear that a decision to join or sever a trial is within the discretion of the trial court."

The judge found "joint trials prevent the inequity . . . of inconsistent verdicts" and "promote[s] judicial efficiency," and "[a]s the defense argues it'll make up in this case for the lost time by the COVID-19 delays." Noting "defendants have requested a joint trial. They have waived evidentiary objections. They are willing to stipulate to the admissibility of certain impermissible evidence, although, admittedly, they haven't gone into detail and it is almost impossible to do that pretrial as to what exactly they would stipulate to or not," the court found the only question to be whether it could "issue the appropriate instructions to a jury." Dismissing the State's concerns that the jury "will be hopelessly confused" and unable "to separate the idea that Cindy's statement should apply only to Cindy," that "David's statement applies only to Dav[id], and Ryan should only go to Ryan," the court found "it is not fatal when some of [the] evidence that applies to one defendant spills over into evidence presented to another defendant."

Finding "[t]hose spillover effects can be cured by jury instruction. They can be cured by evidentiary ruling," the judge determined he was required "to balance the prejudice to the State by the admission of four separate statements against the judicial economy and the preference for one trial." The judge concluded that in his "view, justice — balancing all these considerations — is best served by one trial."

The State appeals, on leave granted, arguing the trial court abused its discretion "by denying the State's severance motion, thus allowing defendants' mutually supporting accounts to pile on each other and spillover to all defendants, tainting the totality of what one jury will consider."

In his recent opinion for the court explaining the standard a judge should apply in deciding a motion to reconsider another judge's interlocutory order, Judge Fisher advised that "[i]f a prior judge has erred or entered an order that has ceased to promote a fair and efficient processing of a particular case, the new judge owes respect but not deference and should correct the error." Lawson v. Dewar, __ N.J. Super. __, __ (App. Div. May 27, 2021) slip op. at 8. We agree with that view, and the importance of the second judge explaining how the case has changed since the first judge decided the issue or how that judge erred,

and thus why a new order is necessary to "right the proverbial ship." <u>Lombardi v. Masso</u>, 207 N.J. 517, 537 (2011).

That was not done here. When the State moved to sever defendants' trials based on their overlapping statements as required by <u>Rule</u> 3:15-2(a), it did not do so because one of the Keoghs inculpated another in their statement to police as in <u>Bruton</u>. None of these defendants confessed to anything. Here, the <u>Bruton</u> issue is that each one of the Keoghs made extensive reference to the other two, both in regard to where they were and what they did after the shooting as well as about two visits Coulanges allegedly made to their home a few months before he was killed. The first judge to consider the matter agreed with the State that those many references could not be effectively deleted without prejudice to the maker, that jury instructions as to the use to be made of the references would not cure the problem, and thus that separate trials, at least as to Ryan and his parents, were required. The second judge recognized the problem, he simply decided he could make evidentiary rulings and craft jury instructions to address any prejudice to the prosecution in light of defendants' willingness to stipulate to the admission of certain, unspecified, impermissible evidence by waiving any <u>Bruton</u> issue.

But the judge didn't explain why he could do with evidentiary rulings and jury instructions what the first judge deemed not feasible. And while defendants' willingness to "waive <u>Bruton</u>," was a change in the posture of the case since the first judge considered the issue, it was not, in our view, a sea change. The <u>Bruton</u> waiver did not alter the hearsay problems presented by admitting each of defendants' statements at a joint trial or the risk of jury confusion posed by cross-exculpatory hearsay "saturating the record." Further, our courts have long recognized that defendants may waive separate trials, even when they have a Sixth Amendment right to stand trial alone, because they perceive it to their strategic advantage to be tried with their co-defendants. <u>See</u> <u>Buonadonna</u>, 122 N.J. at 39 (acknowledging "the right to confront opposing witnesses or obtain severance of a trial is subject to tactical considerations that could lead a reasonable defendant, in consultation with counsel, to waive the right"); Pressler & Verniero, <u>Current N.J. Court Rules</u>, cmt. 1.1 on <u>R.</u> 3:15-2(a) (2021) ("The severance right accorded by this rule may be waived by counsel as a matter of trial strategy and tactics.").

The defendants' ability to secure a perceived tactical advantage by a joint trial makes it incumbent on the court to consider carefully any claim by the State that a joint trial would prejudice the prosecution when the State opposes trying

co-defendants together. As our Supreme Court has noted in another context, "[a] trial should be fair to the people, too, not just to the defendant." State v. Ragland, 105 N.J. 189, 213 (1986). Rule 3:15-2(b) makes clear the court may sever the trials of co-defendants if "the State is prejudiced by a permissible or mandatory joinder of . . . defendants in an indictment or accusation." R. 3:15-2(b). Although a defendant has a constitutional right not to be tried jointly with a co-defendant when that non-testifying co-defendant's statement inculpates the defendant, there is no concomitant right to a joint trial when a co-defendant's statement exculpates a defendant or otherwise aids his defense. See United States v. Rubin, 609 F.2d 51, 65 (2d Cir. 1979) ("This case is an appropriate one for application of the principle that '(no) accused person has any recognizable legal interest in being tried with another, accused with him, though he often has an interest in not being so tried.'" (quoting United States v. Bronson, 145 F.2d 939, 943 (2d Cir. 1944) (L. Hand, J.))). Commentary on the analogous federal rule, F.R.C.P. 14, notes that courts "generally grant[]" requests for separate trials from the government, and that, in fact, courts "refus[e] severance only when a defendant can demonstrate the likelihood of great harm." 25 Robert M. Cipes et al., Moore's Federal Practice, § 614.07 (3d ed. 2021).

Here, defendants asserted no harm to them by separate trials,[9] and, as far as we can tell, made no effort to address the State's claim of prejudice by offering what of their statements they believed necessary to admit on completeness grounds under N.J.R.E. 106 ("If a party introduces all or part of a writing or recorded statement, an adverse party may require introduction, at that time, of any other part, or any other writing or recorded statement, that in fairness ought to be considered at the same time."). See State v. Lozada, 257 N.J. Super. 260, 272 (App. Div. 1992) (explaining the adverse party's requested portion of a writing "may be required to be read if it is necessary to (1) explain the admitted portion, (2) place the admitted portion in context, (3) avoid misleading the trier of fact, or (4) insure a fair and impartial understanding" (quoting United States v. Soures, 736 F.2d 87, 91 (3d Cir. 1984))).

We think it was important, at a minimum, here for the judge to have considered the various charges and the content of the statements — if not ruling on the extent of the admissibility of each in a joint trial as suggested by Cindy's

---

[9]  Indeed, the only issue counsel raised in that regard is David and Cindy's "interest in being in a courtroom with their son" when he faces trial for murder. David and Cindy may, of course, attend their son's trial.  It is only if they intend to testify at that trial would they likely be barred by a sequestration order.  Their raising the issue, however, suggests Ryan would not have any difficulty procuring their testimony in a separate trial, underscoring the absence of any prejudice to defendants by separate trials.

counsel — at least considering the extent of their admissibility and what instructions he might have to deliver to a jury before altering the status quo of Ryan being tried separately from his parents on the State's motion as the first judge ordered.[10] While it was not necessary for the second judge to defer to that

[10] Should defendants pursue joinder by way of a new motion, we think the court should require a proffer from the State as to those portions of defendants' statements it intends to introduce to prove the false swearing or other counts and look to defendants to come forward with what additional portions they would seek to admit under N.J.R.E. 106 in order to explain or place the admitted portions in context, avoid misleading the jury, or insure a fair understanding of the admitted portions in accord with Lozada. 257 N.J. Super. at 272.

From our review of the record, the allegedly false statements David and Cindy are accused in the indictment of making as to where they were, what they did, and when things happened after the shooting appear distinct from the information they provided police about their son, his relationship with Coulanges, the rupture in their friendship and the alleged visits Coulanges made to the Keoghs' home in the months before his death. Because the alleged false statements the State might need to admit in its case against David and Cindy appear to fall into a very narrow corridor — their post-shooting conduct — the rule of completeness may offer little opportunity for the proper introduction of those parts of their statements the State worries will improperly bolster Ryan's defense, prejudicing its murder prosecution. On the other hand, should the State, for example, seek to admit Cindy's statement explaining why she did not go to Coulanges' aid when she saw him lying on the deck — because she had "issues with the young man" — the defense might have a stronger argument for admitting those parts of her statement detailing her past dealings with Coulanges under the rule of completeness.

These musings are not findings, of course. But the failure of the court to require the parties to identify what they would seek to admit at trial of defendants' statements allows us nothing else. They illustrate, however, the necessity of the

29

ruling if he thought it in error, respect required that he identify the error before changing tack. See Lawson, __ N.J. Super. at __ (slip op. at 8).

Without that analysis, we do not see how the second judge could properly weigh the State's claim of prejudice that re-joining defendants' trials allows them to benefit from the self-serving accounts crafted in the nearly two hours they allegedly kept police from the crime scene — particularly David's and Cindy's accounts, which the State maintains it "must play to prove the false swearing counts, but which both serve to buttress Ryan's self-defense claim in hearsay fashion, . . . malign the victim" and which "neatly layer together for a cumulative bolstering of the credibility of that defense while undermining a jury's ability to properly evaluate the evidence."

While "[j]oint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability," State v. Brown, 118 N.J. 595, 605 (1990) (quoting Richardson v. Marsh, 481 U.S. 200, 210 (1987)), neither of those concerns figures prominently here. Only Ryan is charged with murder, and each of defendants' allegedly false

court having a very complete understanding of the likely proofs at trial in order to competently weigh the State's claim of prejudice and whether, given the likely extent of defendants' statements to be admitted in evidence, jury instructions would be adequate to prevent any improper bolstering of the defense and insure the proper evaluation of any admitted hearsay.

30

statements stands alone. There is no doubt but that a joint trial would require careful limiting instructions designed to guard against the jury's improper use of his parents' hearsay statements in evaluating Ryan's credibility, which may be very difficult for a jury to follow, particularly given the number of statements and that the evidence bears on the ultimate issue.[11] See State v. Herbert, 457 N.J. Super. 490, 505 (App. Div. 2019). While judicial efficiency is always an appropriate concern, we do not believe the desire to "make up . . . for the lost time by the COVID-19 delays" should impel a court to alter the status quo by reversing a prior order for separate trials without full analysis of its impact.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[11] It appears that special interrogatories will already be required to assure jury unanimity as a result of the second judge's decision to merge the separate counts of the indictments charging David and Cindy with false swearing into single counts. The State has not appealed that ruling, and thus we do not consider its correctness. We note it only in connection with the difficulties of properly instructing the jury in a joint trial.