**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1628-18

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

TAMAJ R. LEMMON,

      Defendant-Appellant.

_____

Argued January 5, 2022 – Decided January 27, 2022

Before Judges Sabatino, Mayer and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Criminal Part, Passaic County, Indictment No. 17-06-0632.

Marissa Koblitz Kingman, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Jodi Ferguson, Assistant Deputy Public Defender, Marissa Koblitz Kingman and Marc M. Yenicag, Designated Counsel, on the briefs).

Ali Y. Ozbek, Assistant Prosecutor, argued the cause for respondent (Camelia M. Valdes, Passaic County Prosecutor, attorney; Ali Y. Ozbek, of counsel and on the brief).

PER CURIAM

This multi-issue direct criminal appeal arises out of a gang-related fatal shooting. After a jury trial, defendant Tamaj Lemmon was found guilty of first-degree murder of Vishon Randolph, N.J.S.A. 2C:11-3(a) (count one), and other crimes. Randolph was the reputed member of a rival gang. The State's theory was that defendant shot and killed Randolph, and took part in attacking two of Randolph's companions, Tyshawn Daniels and Zimere Kellam, all in retaliation for the recent killing of a member of defendant's own gang.

In addition to Randolph's murder, the jury found defendant guilty of second-degree possession of a handgun for an unlawful purpose against Randolph, N.J.S.A. 2C:39-4(a)(1) (count two); second-degree possession of a handgun for an unlawful purpose against Daniels, N.J.S.A. 2C:39-4(a)(1) (count three); second-degree unlawful possession of a handgun without a permit, N.J.S.A. 2C:39-5(b)(1) (count four); second-degree possession of a weapon for an unlawful purpose against Kellam, N.J.S.A. 2C:39-4(a)(1) (count six); and the lesser-included offense of third-degree aggravated assault of Kellam, N.J.S.A. 2C:12-1(b)(7) (count seven). The jury acquitted defendant on count five, which had charged him with first-degree attempted murder of Daniels, N.J.S.A. 2C:5-1(a)(1) and N.J.S.A. 2C:11-3(a)(1).

A-1628-18

The trial judge imposed a sixty-year custodial sentence, subject to the parole ineligibility period of the No Early Release Act ("NERA"), N.J.S.A. 2C:43-7.2, for Randolph's murder and other offenses merged into the murder. The judge also imposed a consecutive nine-year NERA term for Kellam's aggravated assault, and another consecutive five years for the weapons offense associated to Daniels. Defendant's aggregate sentence therefore is seventy-four years, subject to NERA.

On appeal, defendant presents a host of issues concerning both his conviction and sentence. Having fully considered his arguments, we affirm.

## I.

As shown by the State's proofs, the shooting and the other offenses arose out of a feud between factions of the "UTH" and "DTH" gangs[1] in Paterson. The "UTH" gang included a subgroup called "23XB," of which defendant Tamaj Lemmon was a member. The "DTH" gang included subgroups called the "GND" and the "BSQ". The homicide victim, Randolph, was associated with the BSQ. Randolph was also in the "SCMB," which the State alleged was also affiliated with "DTH", but which the defense claimed was merely a rap music group.

---

[1] We choose to use pseudonyms for the gang names.

A-1628-18

According to the State, defendant's shooting of Randolph was in retaliation for a GND member's killing of Kasir Davis, a member of 23XB, about a month earlier. The State's proofs at trial showed that on the night of Randolph's shooting, defendant and others in 23XB went to a party at a bar. Defendant saw Randolph at the party and, according to the State's witness, asked Randolph if he was affiliated with GND. Randolph reportedly said he was not but admitted to defendant he was on good terms with the members of GND.

After police broke up the party, Randolph started walking home with two friends, Kellam and Daniels. On the street, defendant and another man (Kamari Benbow) approached the trio from behind. Defendant and Benbow fired shots at the trio, causing Randolph to fall to the ground and hitting Kellam in the buttocks. Defendant then stood over Randolph and fired two or three more shots at him, point-blank. Randolph died from the gunshot wounds. Kellam survived the shot in his buttocks and fled with Daniels who was not hurt. Defendant and Benbow also fled.

The incident on the street was filmed by outdoor surveillance cameras operated by local businesses. The prosecution prepared a sixteen-minute composite video of that footage, which was shown to the jury.

A-1628-18

The police arrested defendant a few days later at his residence. They found defendant hiding in his basement boiler room. The police found a loaded handgun on the floor of the boiler room, although that gun was not used in the street shooting. According to defendant, the officers used excessive force when they arrested him.

Defendant was charged with Randolph's murder and other crimes. The court severed the additional charges arising from defendant's arrest.[2]

A hostile encounter later occurred at the courthouse between defendant and a sheriff's officer, Cooper. During that encounter, defendant admitted to murdering Randolph and added that if he were out on the street he would "do [Cooper's] stupid ass, too." Defendant filed a complaint against Cooper, alleging that Cooper threatened him, which resulted in Cooper himself being criminally charged with terroristic threats.

---

[2] Specifically, the severed charges included counts: second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1) (count eight); second-degree unlawful possession of a weapon with a permit, N.J.S.A. 2C:39-5(b)(1) (count nine); third-degree possession of a controlled dangerous substance (CDS) (heroin), N.J.S.A. 2C:35-10(a)(1) (count ten); third-degree possession of a CDS (heroin) with intent to distribute, N.J.S.A. 2C:35-5(a)(1) and N.J.S.A. 2C:35-5(b)(3) (count eleven); second-degree possession of a weapon while committing certain CDS offenses, N.J.S.A. 2C:39-4(a)(1) (count twelve); and fourth-degree aggravated assault, N.J.S.A. 2C:12-1(b)(5)(a) (count thirteen).

The State obtained a sworn statement from Kellam inculpating defendant in the shooting of Randolph. Kellam later wrote a letter recanting his police statement, but thereafter repudiated the recantation and said he had written it under duress.

The State's case hinged largely on the surveillance video, testimony from Kellam and Daniels, and defendant's admission to Cooper. No DNA, fingerprint, or other forensic evidence tied defendant to the shooting. The guns used in the shooting were never recovered.

Defendant testified at trial and denied taking part in or being present at the shooting or any involvement in the other offenses.

As we noted in the introduction, the jury found defendant guilty of murdering Randolph, unlawful purpose gun possession charges with respect to Daniels, and the lesser-included offense of third-degree aggravated assault of Kellam.

On appeal, defendant presents the following arguments in his brief:

POINT I:

THE ADMISSION OF IRRELEVANT, HIGHLY PREJUDICIAL EVIDENCE OF LEMMON'S AND THE VICTIM'S GANG AFFILIATIONS, PURPORTEDLY ON THE ISSUE OF MOTIVE, VIOLATED N.J.R.E. 404(B) AND WAS SO HIGHLY

6

PREJUDICIAL AS TO DEPRIVE LEMMON OF HIS RIGHT TO A FAIR TRIAL.

A. THE FIRST PRONG UNDER [STATE V.] COFIELD[3] WAS NOT MET BECAUSE GANG AFFILIATION WAS NOT RELEVANT TO ESTABLISH MOTIVE.

B. THE FOURTH PRONG UNDER COFIELD WAS NOT MET.

POINT II:

THE TRIAL COURT ERRONEOUSLY ADMITTED IRRELEVANT, HIGHLY PREJUDICIAL EVIDENCE THAT LEMMON WAS FOUND WITH A LOADED GUN AT THE TIME OF HIS ARREST IN CONTRAVENTION OF N.J.R.E. 404(B) AND 403, WHICH DEPRIVED LEMMON OF HIS RIGHT TO A FAIR TRIAL.

A. THE FIRST PRONG UNDER COFIELD WAS NOT MET.

B. THE FOURTH PRONG UNDER COFIELD WAS NOT MET.

C. EVEN IF DEFENSE COUNSEL "OPENED THE DOOR," EVIDENCE THAT LEMMON WAS FOUND WITH A LOADED GUN AT THE TIME OF HIS ARREST SHOULD NEVERTHELESS NOT HAVE BEEN ADMITTED PURSUANT TO N.J.R.E. 403.

---

[3] 127 N.J. 328 (1992).

A-1628-18

POINT III

THE TRIAL COURT ERRONEOUSLY ADMITTED IRRELEVANT, HIGHLY PREJUDICIAL STATEMENTS BY LEMMON, WHICH WERE PREVIOUSLY EXCLUDED BY THE TRIAL COURT.

POINT IV

THE STATE DID NOT PROPERLY AUTHENTICATE THE VIDEO COMPILATION.

POINT V

THE PROSECUTOR ELICITED IMPROPER LAY OPINION TESTIMONY AS TO THE CONTENTS OF THE SURVEILLANCE VIDEO.

POINT VI

THE TRIAL COURT ERRONEOUSLY ALLOWED THE JURY UNFETTERED ACCESS TO THE VIDEO COMPILATION DURING THEIR DELIBERATIONS.

POINT VII

THE PROSECUTOR COMMITTED MISCONDUCT DURING HIS SUMMATION, AND VIOLATED LEMMON'S RIGHT TO A FAIR TRIAL BY ASSERTING FACTS NOT ESTABLISHED IN EVIDENCE, APPEALING TO THE JURY'S EMOTIONS, AND UTILIZING EVIDENCE OUTSIDE THE SCOPE OF ITS PERMISSIBLE PURPOSE.

POINT VIII

THE TRIAL COURT'S JURY INSTRUCTIONS
RELATING TO THE PERMISSIBLE USE OF GANG
AFFILIATION EVIDENCE AND EVIDENCE THAT
LEMMON WAS FOUND HIDING WITH A LOADED
GUN WERE ERRONEOUSLY DEFICIENT.

POINT IX

BECAUSE OF INDIVIDUAL AND CUMULATIVE
ERROR, THIS COURT SHOULD REMAND FOR A
NEW TRIAL.

POINT X

THE SENTENCING JUDGE ABUSED HER
DISCRETION BY IMPOSING CONSECUTIVE
SENTENCES IN VIOLATION OF STATE V.
YARBOUGH.[4]

Some of these issues were not raised, or fully raised, below. With respect

to those particular issues, our review is guided by the "plain error" standard and

by the principles of Rule 2:10-2, which prescribes that "[a]ny error or omission

shall be disregarded by the appellate court unless it is of such a nature as to have

been clearly capable of producing an unjust result[.]" (Emphasis added). See

also State v. Macon, 57 N.J. 325, 338 (1971) (characterizing our court's "plain

error" review as a question of "whether in all the circumstances there was a

---

4  100 N.J. 627 (1985)

reasonable doubt as to whether the error denied a fair trial and a fair decision on the merits[.]")

As for the issues on which defendant brought an alleged error to the trial court's attention, the error "will not be grounds for reversal [on appeal] if it was 'harmless error.'" State v. J.R., 227 N.J. 393, 417 (2017) (quoting State v. Macon, 57 N.J. 325, 337-38 (1971)). In order for an error to be reversible under the harmless error standard, "[t]he possibility [of the error leading to an unjust result] must be real, one sufficient to raise a reasonable doubt as to whether [the error] led the jury to a verdict it otherwise might not have reached." State v. Lazo, 209 N.J. 9, 26 (2012) (quoting State v. R.B., 183 N.J. 308, 330 (2005)).

## II.

We first consider the four issues defendant's counsel chose to emphasize during the appellate oral argument.

### A.
### (Loaded Gun Evidence and Limiting Instruction)

Defendant contends the trial court erred in admitting testimony it had originally disallowed about the loaded gun police found near him in the basement boiler room at the time of his arrest. He argues this evidence was highly prejudicial because the seized gun was not used in the shooting. He further argues the trial court's limiting instruction as to this evidence was

inadequate. We reject these contentions, mainly because defendant's trial attorney, despite having obtained a pretrial ruling to bar the gun evidence, "opened the door" to admit it.

This is the pertinent background. Before trial, the court filed a consent order severing counts eight through thirteen of the indictment, which had charged defendant with crimes arising out of his arrest, including his constructive possession of the gun. The State did reserve the right to elicit testimony regarding the gun if the defense opened the door to such testimony.

Defendant had been arrested at his residence by Detective Angel Perales of the County Prosecutor's Office. On direct examination, Perales did not mention the gun, adhering to the pretrial order. During his cross-examination of Perales, defense counsel asked whether police had obtained any arrest or search warrants before proceeding to defendant's home, and, since he was a suspect, whether they had intended to arrest him there.

Later, when defense counsel raised the subject of warrants again, the prosecutor objected, arguing that defense counsel had opened the door to testimony regarding the gun in the boiler room. The trial court at that point disagreed, but did caution defense counsel about pursuing this line of questioning. The court admonished that defense counsel was "treading

11 <span>A-1628-18</span>

dangerously close to areas that we shouldn't get into," and that it did not "want to open the door" because "it's to the detriment of your client."

Thereafter, defendant on direct examination described what he characterized as his violent arrest. He also testified that he had never owned or handled a gun. At that point, the prosecutor renewed his request for permission to bring up the gun on cross-examination. The prosecutor noted defendant had just told the jury that the police had first attacked him and then arrested him for reasons they allegedly refused to disclose. The prosecutor argued that this testimony presented by the defense, coupled with defendant's claim that he was totally unfamiliar with guns, had opened the door for the State to reveal the reason for defendant's arrest.

The trial court agreed that the defense had opened the door to admit the gun evidence. Although defendant knew he had been arrested because of the gun, he had made it seem to the jury as though he was just going about his day when he was suddenly and arbitrarily assaulted and arrested. The court noted that, up to this point, no testimony had emerged that there was a gun in the boiler room near defendant at the time of his arrest.

The court emphasized it had tried to maintain the integrity of the trial and ensure that the defendant's constitutional rights were protected. It noted that it

12

had not permitted the State to present evidence that defendant was charged with making terroristic threats to law enforcement officers, because of the prejudice to him.

The court then ruled as follows:

> Now we have a situation where the <u>defendant has painted a picture that he was innocently standing in his boiler room when he was arrested and physically assaulted by the police officers for no reason</u>.
>
> In fact, [since] the circumstances of the arrest have now been put out there by defendant[,] <u>to tie the State's hands and not allow them to present their version of the events of the arrest, would be prejudicial to the State</u>.
>
> And this Court has <u>to ensure the integrity of the trial by being fair to both sides</u>. And [defense counsel] has <u>clearly opened the door</u> to this issue by eliciting . . . testimony from his client. . . [w]hich ha[s] <u>painted a false impression of the circumstances of the arrest</u> to the . . . jury.
>
> And <u>to preclude the State from being able to present their version of the facts would be unfair</u>. And it would be a prejudice to the State.
>
> So, I am going to allow the State to cross-examine defendant about the circumstances of his arrest including the fact that a gun was located in the boiler room where the defendant was present.
>
> [(Emphasis added).]

A-1628-18

Although defense counsel disagreed with the court's ruling, the court reiterated that counsel had elicited the at-issue testimony and thereby created a "falsehood" which in fairness had to be addressed by the State.

Thereafter, on cross-examination, defendant testified that he was surprised by police while in the doorway to the boiler room. He denied that he was hiding in the corner of the room. He also denied that he kept his left hand down when he was confronted by Perales and insisted that there was no gun found near his left hand. Defendant did not change his account when the prosecutor showed him a photo of the alleged gun on the boiler room floor.

At this point, and without any objection from defense counsel, the trial court instructed the jury as follows:

> In this case, the State has introduced evidence that the defendant was arrested on 4/24/17 because the police observed a gun on the floor in the boiler room where the defendant was present.
>
> The Court is <u>allowing this testimony for the limited purpose of explaining the State's position as to the circumstances of the arrest of the defendant on 4/24/17. There is no dispute that the weapon recovered is not the weapon involved in the alleged offenses</u>.
>
> The defendant has given his account of the facts surrounding his arrest and the State is now giving their account. Whether this testimony does in fact explain the circumstances of the defendant's arrest is for you to decide.

14

You may not, however, use this testimony as substantive evidence or proof of the underlying charges. I further instruct you that you may not use this evidence to decide [that] . . . defendant has a tendency to commit crimes or that he is a bad person.

That is, you may not decide that just because there allegedly may have been a gun in the boiler room where the defendant was present when he was arrested that the defendant must be guilty of the crimes. I have admitted the evidence only to help you consider the specific circumstances of the defendant's arrest.

You may not utilize this evidence for any other purpose and may not find the defendant guilty of the underlying offenses simply because the court has allowed this testimony.

[(Emphasis added).]

On redirect, defendant insisted that: (1) police were rough with him; (2) he was in the doorway to the boiler room, not actually in the room, when the police arrived; (3) there was no gun near his left hand; (4) he did not put a gun in the boiler room and was not aware that one was there; and (5) he did not have a permit for a gun and was unaware that there was a gun in the house.

Following defendant's testimony, the prosecutor recalled Perales to the stand. Perales testified that, as he got his hands on defendant in the boiler room and threw him down, he noticed a Smith & Wesson revolver on the floor. Perales stated that defendant could have easily grabbed this gun, which was later

15

determined to be loaded, if he had dropped to his knees.  Perales confirmed that the gun was not the murder weapon.

Based on the circumstances as they unfolded, we conclude the trial court did not err in allowing the gun evidence, nor in its application of "opening the door" evidentiary principles.

The "opening the door" doctrine is a "rule of expanded relevancy" through which otherwise irrelevant or inadmissible evidence may sometimes be admitted if the "opposing party has made unfair prejudicial use of related evidence." State v. James, 144 N.J. 538, 554 (1996) (citing United States v. Lum, 446 F.Supp 328 (D.Del.), aff'd, 605 F.2d 1198 (3rd Cir. 1979)).  In criminal cases, the doctrine "operates to prevent a defendant from successfully excluding from the prosecution's case-in-chief inadmissible evidence and then selectively introducing pieces of this evidence for the defendant's own advantage, without allowing the prosecution to place the evidence in its proper context."  Ibid. (citing Lum, 466 F.Supp. at 334-35).  The doctrine is limited by N.J.R.E. 403, thus evidence to which a defendant has "opened the door" may still be excluded if a court finds that its probative value is substantially outweighed by the risk of undue prejudice.  Ibid.

A-1628-18

Defendant now contends the gun evidence should have been excluded as prior "bad act" evidence under N.J.R.E. 404(b) and as unduly prejudicial under N.J.R.E. 403. We disagree.

It was not necessary for the court to analyze the gun evidence under N.J.R.E. 404(b), as it had already been excluded from the case under the pretrial order when the parties agreed to sever counts eight through thirteen of the indictment from this case. After defense counsel disregarded this limitation and the trial court's warning, and opened the door to circumstances of the arrest, the court reasonably determined the gun evidence had newly enhanced probative value. As the court justifiably noted, once defense counsel opened the door, the State was entitled to present its own version of the arrest and counteract a potentially false impression made by the defense. That probative value was not substantially outweighed by its prejudicial effect.

Perales's testimony about the gun as a recalled witness for the State was appropriate, after defendant in his own testimony had steadfastly denied any awareness of the gun. While the fact that the gun was loaded may not have been essential to Perales's description of the arrest, that fact did confirm the threat posed to police at the scene.

Defendant argues the prosecution, in its pursuit of justice, and the trial court, as a neutral arbiter of his trial, should have prevented the jury from learning about the gun. But these arguments fail because it was defense counsel's own choice to inject into the case the circumstances of the arrest and to present a claim and theme of police mistreatment.

The pretrial order disallowing the gun evidence at the severed trial was designed for defendant's benefit. Defense counsel nevertheless elected at trial to forego that benefit and delve into the facts surrounding the arrest before the jury. We need not speculate here what reasons prompted defense counsel's strategy. Regardless of the nature or wisdom of that strategy, the defense opened the door to allow the State to present counterproofs, including the gun.

Relatedly, defendant contends for the first time on appeal that the trial court's limiting instruction about the gun was inadequate. We disagree. As a preliminary matter, a trial court's curative jury instructions are reviewable only for an abuse of discretion. State v. Herbert, 457 N.J. Super. 490, 503 (App. Div. 2019). Here, the instruction was clear, direct, and timely. See State v. Vallejo, 198 N.J. 122, 134-36 (2009) ("Generally, for an instruction to pass muster in such circumstances, it must be firm, clear, and accomplished without delay."). It appropriately informed the jury the gun had not been used in the shooting. It

18

explained the limited uses for which the jury could consider the evidence. The instruction was repeated in the final jury charge, again without objection. We must presume the jury followed the court's instructions. See State v. Herbert, 457 N.J. Super. 490, 504 (App. Div. 2019) (subject to certain rare exceptions, "[t]he authority is abundant that courts presume juries follow instructions[.]")

## B.
### (Defendant's Statements to the Sheriff's Officer)

Defendant contends the trial court erred in admitting previously excluded threatening statements and admissions he allegedly made at the courthouse to a Passaic County Sheriff's Security Officer, Fidel Cooper. This, too, is an instance of defense counsel opening the door for the State to present competing proofs. The doctrine of completeness further justifies admitting the State's evidence. The relevant background is as follows.

As described by Officer Cooper, at 9:00 a.m. on May 22, 2018, he transported defendant by elevator within the courthouse to the holding area adjacent to the courtroom. He had never met defendant before. Upon arrival, defendant initially resisted Cooper's requests for him to step into the holding cell because he was accustomed to waiting in a conference room for court proceedings to begin. When defendant finally complied, Cooper advised fellow

A-1628-18

Security Officer Herman Vega that they had arrived, and Vega told him to take defendant to the conference room instead.

According to Cooper, while he and defendant were alone in the conference room, defendant said, "You're a fucking . . . rookie. You see, I told you that I always get dressed in here". Although Cooper told him to be quiet, defendant continued to curse at and insult him and then nonchalantly said, "I'm here for murder" and "I did that shit, and I'm going to beat that shit". As recounted by Cooper, defendant also said that: (1) Cooper "wouldn't have been acting like this if [Cooper] was on the street"; and (2) "he would do [Cooper's] stupid ass too".

Cooper immediately summoned Vega to report defendant's statements. When Vega came in, defendant was still cursing at Cooper, but then he stopped and screamed, "Oh, [Cooper's] going to kill me. [He's] going to kill me". Vega told defendant to calm down.

Cooper related that defendant subsequently filed a complaint against him alleging that Cooper had threatened him by saying, "Shut the fuck up, you little piece of shit," and "I hope your little stupid ass win your trial so I can kill you myself since you think you're getting away with murder". Cooper denied threatening defendant. As a result of defendant's complaint, Cooper was

20 <span>A-1628-18</span>

charged with third-degree terroristic threats, which exposed him to a possible five-year prison term and the loss of his job.

Vega testified that he heard defendant call Cooper a "fucking rookie," and confirmed that Cooper advised him of defendant's confession and threats. Vega stated that he heard defendant say in a monotone voice, "Help, he's going to kill me. He threatened to kill me". Vega did not hear Cooper threaten defendant.

Prior to trial, the State sought the admission of these two sets of statements allegedly made by defendant to Cooper on May 22, specifically: (1) "You ain't read my charges, rookie. I'm here for murder and I did that shit and I'm gonna beat that shit;" and (2) "You're only acting tough 'cause I'm shackled. You wouldn't be acting like that if we were on the streets 'cause I would do your stupid ass, too".

Following a hearing during which Cooper and Vega testified, the trial court ruled that: (1) the first set of statements was admissible as a defendant's statement against interest under N.J.R.E. 803(c)(25); and (2) the second set of statements was not admissible because its prejudicial weight sufficiently exceeded its probative value under N.J.R.E. 403. As to the latter, the court explained:

> If this Court was trying the case regarding the terroristic threats[,] then this Court might be more

21

inclined to allow th[ose] particular two statements in, if you will. I understand that the State is indicating that it wants that statement in because it's relevant and it's probative, however, it talks about a future act versus a prior act or the act we're talking about here. It talks about a future murder and so for that reason this Court finds that the probative value is outweighed by the prejudicial value to the defendant, so I am not going to allow [it] in[.]

During trial, the court learned that defendant had filed a complaint against Cooper alleging that Cooper had threatened him, and that Cooper had been charged with third-degree terroristic threats.

On June 21, 2018, the court cautioned defense counsel that if he asked Cooper whether he threatened defendant and he denied it, counsel would not be able to ask any questions regarding the substance of the alleged threats. As the court initially analyzed the issue, the only way to get in the exact statements allegedly made by Cooper was through defendant. Defense counsel would not be allowed to read from the complaint and ask Cooper whether he had made a particular alleged threat.

A short while later, however, the trial court reconsidered its ruling, relying upon the doctrine of completeness and the permissible bounds of cross-examination to assess credibility. On reflection, the court ruled that defense counsel could cross-examine Cooper as to the specific threats he was accused of

22

making, but if he "opened the door" in this way, then the previously excluded threat allegedly made by defendant to Cooper would come in as well. In the court's view, because the allegations all dealt with reciprocal terroristic threats, it was an all-or-nothing scenario, and it was up to the jury to determine Cooper's and defendant's respective credibility.

On the next trial day, the court further explained its ruling concerning the statements, which it based upon a review of N.J.R.E. 607, N.J.R.E. 611 and N.J.R.E. 803(c)(25):

> Here, the case law makes clear that any party may attack or support the credibility of a witness by direct and cross-examination upon the issues involved. The State here is introducing the alleged conversation that took place between the defendant and Special Officer Cooper . . . . Thus, the State is bringing before this jury the contents of the alleged conversation. Thus, the issue sought to be explored on cross-examination is relevant.

> Furthermore, under the doctrine of completeness, the entire alleged conversation should come in. It is for the jury to determine the credibility of the officer and whether the statements were made. The State can surely explore with the witness the fact that the complaint was not filed by the defendant for more than two weeks after . . . the conversation took place. The facts and circumstances surrounding the complaint, such as the timing, are factors the jury can consider in determining the credibility of the alleged threats. In fact, the jury instruction on defendant's statement clearly provide you should take into consideration the

facts and circumstances as to how the statement was made, as well as all other evidence in this case relating to this issue.

Based upon all of the foregoing evidence rules and the case law, this Court will permit the defendant to ask Special Officer Cooper if certain statements were made by him during the alleged exchange on May 22, 2018.

However, should the defendant seek to ask these questions, the Court will allow the State to introduce the statement that the defendant allegedly made to Officer Cooper, [i.e.] that he's lucky he's in shackles, because if they were out on the street, he'd do his ass too.

The State will not, however, be permitted to tell the jury that . . . there is a charge pending against the defendant for terroristic threats.

In addition, the defendant will not be permitted to provide the jury with a copy of the complaint [against Cooper], nor will he be permitted to hold a copy of the . . . [complaint] in his hand in front of the jury while he's questioning him. He can simply ask if certain statements were made.

[(Emphasis added).]

Thereafter, Cooper testified that, after he denied being familiar with the charges against defendant, defendant then said, "I'm here for murder," and "I did that shit, and I'm going to beat that shit". When Vega came in, defendant

24

stopped cursing at Cooper and screamed, "Oh, you're going to kill me. You're going to kill me". Cooper denied threatening defendant.

Cooper acknowledged that defendant had filed a complaint against him alleging that Cooper had threatened him. Cooper denied saying to defendant, "shut the fuck up, you little piece of shit," and "I hope your little stupid ass win your trial so I can kill you myself since you think you're getting away with murder".

Immediately after this testimony, the trial court administered the following instruction:

> Ladies and gentlemen, you've now heard some testimony that this officer was charged with a third-degree offense. This officer enjoys the presumption of innocence, and, therefore, I would instruct you to consider that in your deliberations as well.
>
> In addition, you have provided with, for your consideration, some oral statements that were allegedly made by the defendant. It is your function to determine whether or not the statements were actually made by the defendant, and if made, whether the statements or any portion of the statements are credible.
>
> In considering whether or not an oral statement was actually made by the defendant and, if made, whether it is credible, you should receive, weigh, and consider this evidence with caution, based upon the generally recognized risk of misunderstanding by the hearer or the ability of the hearer to recall accurately the words used by the defendant. The specific words

25

used . . . and the ability to remember them are important to the correct understanding of any oral communication because of the presence or absence or change of a single word may substantially change the true meaning of even the shortest sentence. You should, therefore, receive, weigh, and consider such evidence with caution.

In considering whether or not the statement is made or the statements were made, you should take into consideration the circumstances and facts as to how the statements were made, as well as other evidence in this case relating to this issue.

If, after consideration of all the facts, you determine that the statement was not actually made or the statements were not actually made[,] or the statements are not credible, then you must disregard the statements completely.

If you find the statements were made and that part or all of the statements are credible, you may give what weight you think appropriate to the portion of the statements you find to be truthful and credible.

Thereafter, on redirect, Cooper testified that defendant also said to him that Cooper would not have been acting like this if they were "on the street" because "he would do my stupid ass too".

Our review of these issues is guided largely by the principles of "opening the door," which we have already described, supra, in Part II(A), see James, 144 N.J. at 554, and by the doctrine of completeness.

The doctrine of completeness dates back to the common law. Its principles have been codified, for example, in N.J.R.E. 106. "'Under th[e] doctrine of completeness [under N.J.R.E. 106], a second writing may be required to be read if it is necessary to (1) explain the admitted portion; (2) place the admitted portion in context; (3) avoid misleading the trier of fact, or (4) insure a fair and impartial understanding.'" State v. Lozada, 257 N.J. Super. 260, 270 (App. Div. 1992) (quoting United States v. Soures, 736 F.2d 87, 91 (3d Cir. 1984)).

"The object of the rule is to permit the trier of the facts to have laid before it all that was said at the same time upon the same subject matter." State v. Gomez, 246 N.J. Super. 209, 217 (App. Div. 1991) (citing State v. Wade, 99 N.J. Super. 550, 556-57 (App. Div. 1968)). The determination of whether fairness requires inclusion of such additional evidence rests in the sound discretion of the trial court. Lozada, 257 N.J. Super. at 272.

Although N.J.R.E. 106 speaks only to the doctrine of completeness with respect to writings and recorded statements, the parties agreed at oral argument that case law extends these principles to oral communications as well. See, e.g., James, 144 N.J. at 554 (stating the doctrine applies, among other things, to

conversations); State v. DeRoxtro, 327 N.J. Super. 212, 223 (App. Div. 2000) (applying it to unrecorded phone calls).

The trial court reasonably applied these principles here. The testimony shows that defendant and Cooper engaged in heated discussion at the courthouse. Both of them allegedly made threatening statements, which defendant voiced while also admitting to having committed a murder. Once defense counsel opened the door to that exchange, the trial court reasonably allowed evidence of both participants' alleged words to be considered by the jury, for context. In addition, the court's limiting instruction was thorough and clear.

## C.
### (The Detective's Lay Opinion of What Was Shown on the Composite Video)

Defendant contends he was denied a fair trial because of improper lay opinion testimony from Paterson Police Detective Abdelmonin Hamdeh about the contents of the compilation of DVD footage from surveillance cameras. Because this issue was not raised below, we consider it under the plain error standard. We are satisfied that no error, let alone plain error, occurred.

During Hamdeh's direct testimony, the prosecutor played the compilation DVD and Hamdeh offered commentary regarding its contents. Hamdeh, in fact,

had reviewed the original surveillance videos as part of his investigation and had authenticated the composite video for the court.

To help the jury understand what they were looking at, Hamdeh identified which camera the footage came from, named the streets that were visible in the footage, pointed out various landmarks such as the bar where the party took place and the throngs of people standing outside, and cross-referenced a map of the area which had already been shown to the jury. He also flagged each time the three victims, who were readily identifiable because of their clothes, appeared together on camera.

While commenting on the first segment, Hamdeh directed the jury's attention to two individuals ("suspect one" and "suspect two"), who appeared together throughout the compilation. He stated that these individuals (whom he did not name) could be spotted despite the poor quality of the footage because suspect one was wearing pants with a Nike swoosh symbol on one side, while suspect two was wearing shoes with white bottoms. He subsequently pointed out these "suspects" three more times. Hamdeh also noted when suspect one dropped something in the street in front of Harry and Phil's Auto Wrecking. He did not identify the dropped item and did not comment on the shooting that followed.

29

On cross-examination, defense counsel questioned Hamdeh as follows:

> [DEFENSE COUNSEL]: Okay. So, in – the videos that you looked at you were not able to identify any particular individual; were you? I believe you didn't testify that you w[ere] able to identify any individual; correct?
>
> [HAMDEH]: From the videos?
>
> [DEFENSE COUNSEL]: Yes . . . . [D]id you testify that you were able to identify any of the individuals in the videos?

Before Hamdeh could answer, the prosecutor objected and thereafter argued at sidebar that defense counsel had just opened the door for Hamdeh to identify suspect one as defendant, an identification Hamdeh had not been permitted to make during his direct testimony even though he did recognize defendant in the video. The trial court refused to permit this, but it did chastise defense counsel for asking questions that were overbroad. The court directed defense counsel to rephrase his question. Defense counsel then asked Hamdeh "in your previous testimony you were able to identify the three – individual victims, correct?" and Hamdeh acknowledged that he had.

The governing principles of lay opinion in this context are well established. Testimony from a lay witness in the form of opinions or inferences may be admitted if it is "rationally based on the witness' perception," and "will

assist in understanding the witness' testimony or determining a fact in issue." N.J.R.E. 701. The purpose of N.J.R.E. 701 is to "ensure that lay opinion is based on an adequate foundation." State v. Bealor, 187 N.J. 574, 586 (2006) (citing Neno v. Clinton, 167 N.J. 573, 585 (2001)). Perception "rests on the acquisition of knowledge through use of one's sense of touch, taste, sight, smell or hearing." State v. McLean, 205 N.J. 438, 457 (2011).

A non-expert may give his opinion on matters of common knowledge and observation, Bealor, 187 N.J. at 586, but may not offer an opinion on a matter "not within [the witness's] direct ken . . . and as to which the jury is as competent as [the witness] to form a conclusion." McLean, 205 N.J. at 459. Lay opinion "is not a vehicle for offering the view of the witness about a series of facts the jury can evaluate for itself[.]" Id. at 462. However, testimony that just involves the relaying of observed facts does not implicate this Rule. Id. at 460. Testimony of that type "includes no opinion, lay or expert, and does not convey information about what the officer 'believed,' 'thought' or 'suspected,' but instead is an ordinary fact-based recitation by a witness with first-hand knowledge." Ibid.

Defendant now contends for the first time that Hamdeh's testimony regarding the contents of the compilation DVD constituted improper lay opinion

31

testimony. Specifically, he claims that Hamdeh was improperly permitted to opine that "an individual depicted on one video was the same individual depicted murdering the victim on another video". He argues that Hamdeh "based his opinion solely on what he saw in the surveillance video and not on any information he independently possessed".

In its very recent opinion in State v. Singh, 245 N.J. 1, 17-20 (2021), our Supreme Court held that although a testifying police officer had improperly referred to an individual depicted in a surveillance video as "the defendant" in his narration of that video, the error was harmless since the reference was fleeting and the officer primarily identified that individual as "the suspect." The Court directed that, in the future, "in similar narrative situations, a reference to 'defendant,' which can be interpreted to imply a defendant's guilt . . . should be avoided in favor of neutral purely descriptive terminology such as 'the suspect' or 'a person.'" Id. at 18.

Here, Hamdeh never identified the individuals depicted on the surveillance video compilation as "defendants." He did not comment on the actual shooting. His testimony did not go beyond the evidence gathered in the case, and it was helpful to the jury given the poor visual quality of portions of the video. Hamdeh did not, in contravention of Lazo, 209 N.J. at 24, bolster or

vouch for Kellam's testimony about the shooting or the identity of the shooters. Moreover, the jury was free to disregard Hamdeh's testimony if it so chose. We discern no plain error that compels a new trial.

## D.
### (The Prosecutor's Comments in Summation)

Defendant contends for the first time on appeal that he was denied a fair trial as a result of improper comments made by the prosecutor during his closing argument. Having reviewed the comments in context, we conclude that defendant, who did not object to them, is not entitled to a new trial on this basis.

A conviction may be reversed based on prosecutorial misconduct only where the misconduct is so egregious in the context of the trial as a whole as to deprive the defendant of a fair trial. State v. Wakefield, 190 N.J. 397, 435-38 (2007). When the alleged misconduct involves a particular remark, a court should consider whether: (1) defense counsel objected in a timely and proper fashion to the remark; (2) the remark was withdrawn promptly; and (3) the court gave the jury a curative instruction. State v. Smith, 212 N.J. 365, 403-04 (2012); State v. Zola, 112 N.J. 384, 426 (1988).

When defense counsel fails to object at trial, a reviewing court may infer that counsel did not consider the remarks to be inappropriate. State v. Vasquez, 265 N.J. Super. 528, 560 (App. Div. 1993) (citing State v. Johnson, 31 N.J. 489,

511 (1960)). In situations such as the present one, where prosecutorial misconduct is being raised for the first time on appeal, a reviewing court need only be concerned with whether "the remarks, if improper, substantially prejudiced the defendant['s] fundamental right to have the jury fairly evaluate the merits of [his or her] defense, and thus had a clear capacity to bring about an unjust result." Johnson, 31 N.J. at 510.

A prosecutor is expected to make a "'vigorous and forceful'" closing argument to the jury. Lazo, 209 N.J. at 29 (quoting State v. Smith, 167 N.J. 158, 177 (2001)). A prosecutor may make remarks that constitute legitimate inferences from the facts, provided he or she does not go beyond the facts before the jury. State v. R.B., 183 N.J. 308, 330 (2005). A prosecutor may also respond to arguments raised by defense counsel during his or her own summation. State v. Munoz, 340 N.J. Super. 204, 216 (App. Div. 2001). A prosecutor may not, however, make arguments contrary to the material known facts in the case, regardless of whether that information has been presented to the jury. State v. Sexton, 311 N.J. Super. 70, 80-81 (App. Div. 1999).

Defendant now argues for the first time that he was prejudiced when the prosecutor made unsupported and inaccurate factual assertions during his summation. Specifically, defendant complains that the prosecutor: (1)

repeatedly stated that defendant was depicted in the video compilation, when no one had actually identified defendant in that video; and (2) misquoted Kellam's testimony regarding the conversation between Randolph and defendant at the party by stating Randolph told defendant that he was not in GND, "but those are my people," rather than "but [I'm] cool with them".

The prosecutor was entitled to infer that defendant was depicted in the video based upon Kellam and Daniels' description of the murder and the suspects' attire without having seen the video, Kellam's repeated identification of defendant as the murderer, and defendant's statements to Cooper. Although defendant disputes Kellam's identification because he temporarily recanted it, this identification, which was reaffirmed by Kellam to the police and during his trial testimony, was part of the record.

Moreover, although the prosecutor did misquote what Randolph said to defendant at the party, the gist was the same and defendant has not set forth any specific prejudice resulting from that misquote. As such, the prosecutor's remarks were a fair comment on the evidence, and the one time he misspoke was a fleeting error that did not prejudice defendant.

Next defendant contends for the first time that the prosecutor improperly appealed to the jury's emotions when he stated:

"I did that shit, and I'm going to get away with that shit and if I saw you out on the street I'd do your stupid ass, too." Bold, brazen, heartless. What kind of person would say that, would brag about taking the life of another? What kind of person would threaten an officer during the jury selection portion of his murder trial? Probably the kind of person that's capable of looking [Randolph] in the eyes as he lays helplessly on the ground and firing multiple shots to his face and head.

[Daniels] and [Kellam] were lucky to survive, however, [Randolph] is dead. He is gone and he was 19 years old. He left behind a little girl. He will never see his daughter grow up, never hear her say her first words, watch her take her first steps. She will never know the sound of his voice. All she will have is a box of pictures of a 19 years old father that she will never know and all for what? So sad.

While defendant is correct that a prosecutor may not seek a verdict based upon an appeal to the emotions of the jury, that is not automatic grounds for reversal, particularly where, as here, no objection was made. State v. Williams, 113 N.J. 393, 448-56 (1988).

Here, the first set of remarks addressed defendant's statement to Cooper and the circumstances of Randolph's death, as testified to by Kellam and depicted in the compilation video. As such, they contained fair comment based on the evidence and were not simply a bare appeal to emotion. That said, we do disapprove of counsel's two rhetorical questions about "what kind of person

would commit such acts?" as being a propensity-based argument contrary to N.J.R.E. 404(b). However, we are unpersuaded the rhetorical queries, which drew no objection, rendered the jurors incapable of deciding the case based on the evidence.

Although the second set of remarks did reference Randolph's personal life and the sad consequences of his murder were improvident, they were fleeting enough so as not to have deprived defendant of a fair trial in light of the substantial evidence against him. As such, we reject this portion of defendant's argument as well.

Lastly, defendant contends for the first time that the prosecutor improperly used the fact that defendant was found with a gun at the time of his arrest to establish that defendant committed the crimes for which he was presently on trial. The passages cited by defendant read as follows:

> [T]his case has a lot of pieces . . . that all work together to come to the ultimate outcome that it's come to and I want to talk about that a little bit, or just a couple of the key things down right here.
>
> Well, there's a video of him there. [Kellam] says he saw him do it. When the cops got to his house he was hiding in a boiler room with a gun and when he was back there he said, I did that shit and I'm going to get away with that shit.

Where was the defendant when the cops came? Why didn't he answer the door? Was he on the couch surprised [by] . . . the officers' arrival? Was he watching TV with his brother? . . . No, he was in the closet hiding with a gun. He was there to fix the boiler. I bet.

Why was he hiding in that closet? Because he didn't want the officers to find him. Why did he not want the officers to find him? Because he did that shit and he's trying to get away with that shit.

While he was being arrested, and you heard Detective Perales testify that he got in there, saw [defendant] hiding in the corner, told him to put his hands up. He put one hand up, the other one he was a little hesitant and like Perales said, action is faster than reaction. He has to go home at night. He grabbed him, he threw him to the floor because he saw that gun.

Although defendant now insists that the prosecutor's comments exceeded the limited basis on which the trial court admitted the gun evidence, we disagree. The first four paragraphs quoted above do not mention the gun, and the last paragraph is proper comment on the circumstances of defendant's arrest. As to the other two paragraphs, which also addressed the circumstances of defendant's arrest, the thrust of the prosecutor's comments was that defendant was hiding because he was conscious of his guilt. Although the mention of the gun in this context was arguably gratuitous, it appears the prosecutor was not suggesting that defendant was found with the gun involved in this case. As such, and

38

because the jury was repeatedly instructed that the gun in the boiler room was not the murder weapon, and that mention of the gun was only made to clarify the circumstances of defendant's arrest, we reject this aspect of defendant's argument.

In light of the foregoing, and given that the jury was generally instructed that counsel's remarks in closing were not evidence, we reject defendant's contention that he was denied a fair trial as a result of prosecutorial misconduct during summation.

## III.

We turn briefly to the additional points made in defendant's brief.

### A.
### (Gang Affiliation Testimony and Limiting Instruction)

We reject defendant's argument that the trial court unfairly admitted evidence that he and other participants in the events leading up to and at the shooting were members of rival street gangs. Although evidence of gang membership often should be excluded from criminal trials under N.J.R.E. 403 because of its potential inflammatory impact, see State v. Goodman, 415 N.J. Super. 210, 228-31 (App. Div. 2010), that general preference for exclusion is overcome by the inherent nature of this case: a killing allegedly motivated by a previous gang killing. The jurors were reasonably informed of the gang

affiliation evidence to understand the case. The court also provided a sensible and fair limiting instruction to the jurors to guide their consideration of such evidence.

## B.
### (Authentication of the Surveillance Video)

We are satisfied Detective Hamdeh supplied an adequate foundation to admit the composite surveillance video. The rational foundation required for authentication under N.J.R.E. 901 was established, see State v. Hannah, 448 N.J. Super. 78, 88 (App. Div. 2016), even though Hamdeh did not personally create the composite DVD. The composite was a fair practical alternative to forcing the jurors to watch hours of original footage from multiple surveillance cameras. See N.J.R.E. 1006 (allowing summaries of voluminous evidence). The likely reasons for variations in certain time stamps was reasonably explained.

## C.
### (Jury Access to the Video During Deliberations)

Defendant was not deprived of a fair trial by the jury's access to the compilation video in the jury room. Because the video had no audio track, it contained no testimony or statements, and therefore the holding of State v. A.R., 213 N.J. 542, 558-61 (2013), disapproving of unfettered access to "audio or video-recorded statements in the jury room during deliberations" is not on point.

A-1628-18

(Emphasis added). Moreover, the court reasonably granted the jury's request to play back eight portions of the video in the courtroom, and duly instructed the jurors not to give such evidence undue weight.

## D.
### (Cumulative Trial Error)

We reject defendant's claim he is entitled to a new trial based on alleged cumulative error under State v. Orecchio, 16 N.J. 125, 129 (1954). The alleged errors at this hard-fought trial were either not errors at all, or they were insignificant enough so as to not require a new trial. And, as we have already pointed out, a number of the claimed matters of undue prejudice emanated from defense counsel's own actions that opened the door to additional proofs by the State.

## E.
### (Sentencing)

Lastly, we reject defendant's argument that his aggregate sentence was excessive, and that the trial court unfairly imposed sentences that were made consecutive to the murder conviction. Defendant has not demonstrated the court abused its discretion in identifying and weighing the aggravating factors for this brutal homicide documented by evidence that he stood over a helpless victim and shot him again. See State v. Case, 220 N.J. 49, 65 (2014). The consecutives

41

sentences for the offenses against the three victims (decedent Randolph and the two survivors, Kellam and Daniels) are justified under State v. Yarbough, 100 N.J. 627, 643-44 (1985). We discern no reason to remand for the trial court to further consider the overall fairness of the sentence.

IV.

To the extent we have not addressed them, all other points raised on appeal lack sufficient merit to warrant comment. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION